[No. A012401. First Dist., Div. Three. June 14, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE CHRISTOPHER HERNANDEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Parts III, IV, V, and VI are not certified for publication (Cal. Rules of Court, rules 976(b) and 976.1).

**COUNSEL**

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

SCOTT, J.—Appellant Lawrence Hernandez was convicted by a jury of first degree murder (Pen. Code, §§ 187, 189), two counts of robbery (Pen. Code, § 211), attempted burglary (Pen. Code, § 459), and two counts of possession of a concealable firearm by a convicted felon (Pen. Code, § 12021). In addition, the jury found that he used a firearm during commission of the murder and robberies. (Pen. Code, §§ 12022.5, 1203.06.) He was sentenced to twenty-five years to life for the murder, plus a two-

year enhancement for the firearm use, plus consecutive terms for one of the robberies, the attempted burglary, and one of the possession offenses. This case has been retransferred to this court for "reconsideration in light of *People* v. *Dillon* (1983) 34 Cal.3d 441, 472-489 [194 Cal.Rptr. 390, 668 P.2d 697], and *People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243]."

# I

Joseph and Gertrude Wolfe operated a coin shop in Concord. Mr. Wolfe regularly carried coins and cash to and from the shop in a blue bag. Shortly before midnight on January 31, 1980, the Wolfes were called by Bay Alarm, which provided the store's alarm system. A panel on the rear wall had been pushed in, disturbing the alarm wires. Appellant's fingerprint was on the panel.

On the next afternoon, an alarm company employee repaired the damaged wall. As he left the store at about 4:30 p.m., appellant entered. Appellant told Mrs. Wolfe that he had some coins for sale, looked at other coins, and then pulled a gun and held it at her back. He ordered the couple to lie on their stomachs close to a small safe. He said "I see you coming in here and going out with a blue bag," and asked for the bag.

Appellant threatened the Wolfes and used foul language. He said he knew where they lived and mentioned their address. He knew they had a grandson and threatened to blow up their apartment.

He commanded Joseph Wolfe, who was 67, to crawl backward and open the small safe. Wolfe complied, and his wife heard the sound of coins being pulled out of the safe and into a bag. Appellant then demanded that Wolfe open a larger safe in another room. Wolfe crawled to the larger safe and opened it. Appellant put on some thin gloves and emptied a coffee can full of silver dollars into his bag. Wolfe then collapsed, fell forward, and hit his head upon the wall. Appellant then fled.

Wolfe died. The examining pathologist testified that Wolfe suffered from atherosclerosis, and that in such persons psychological stress can cause death. In his opinion, the stress of the robbery, including the verbal abuse and abnormal body positions, triggered arrythmia, which caused Wolfe's heart dysfunction and death.

When appellant was arrested a few days later, he was riding a new motorcycle purchased for $7,000 cash. In his possession was a .25 caliber automatic weapon, with six rounds of ammunition. A search of his motor-

cycle storage compartment revealed a printed business card from the Concord Coin Shop, and a sketch of the layout of the Concord Coin Shop. Appellant's thumbprint was found on the sketch.

Appellant did not testify. Two witnesses testified in his behalf that he was clean shaven before February 1, 1980, although Mrs. Wolfe testified that he had a beard at the time of the murder.

## II

Appellant's contentions that he was improperly convicted of first degree felony-murder are unpersuasive. ■ First, his argument that the felony murder rule is unconstitutional because it allows the jury to presume malice has been squarely rejected by the Supreme Court in *People* v. *Dillon, supra,* 34 Cal.3d 441, 472-476. As the *Dillon* court explained, in this state malice is not an element of felony murder. (*Ibid.*)

■ Appellant does not dispute the sufficiency of the evidence that the robbery caused his victim's death. Instead, he contends that the felony-murder doctrine should be inapplicable because he did not shoot or initiate any life-threatening violence against his victim. ■ However, the purpose of the felony-murder doctrine is to deter those engaged in felonies from killing negligently or accidentally. (See *People* v. *Smith* (1984) 35 Cal.3d 798, 803 [201 Cal.Rptr. 311, 678 P.2d 886].) As the *Dillon* court recognized, first degree felony murder encompasses "a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol, and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 477.) ■ The felony-murder doctrine is applicable when there is substantial evidence to prove that a robbery caused a victim's fatal heart attack. (*People* v. *Stamp* (1969) 2 Cal.App.3d 203, 209-211 [82 Cal.Rptr. 598].) Appellant attempts to distinguish *Stamp* on the ground that in that case there was a battery inflicted upon the heart attack victim, whereas in this case there was no evidence that appellant touched Mr. Wolfe. However, we consider that difference insignificant. "As long as the homicide is the direct causal result of the robbery the felony-murder rule applies whether or not the death was a natural or probable consequence of the robbery." (*Id.,* at p. 210.)

■ Appellant also contends that the merger doctrine precludes application of the felony-murder rule in this case. We disagree. Ordinarily the felony-murder rule is inapplicable when based on a felony which is an in-

tegral part of and included in fact within the homicide. ■ For example, the doctrine does not apply where the purpose of the underlying felony was the assault which resulted in death. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 538-540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) ■ Nevertheless, the doctrine may apply even if the underlying felony was included within the facts of the homicide and was integral thereto, if that felony was committed with an independent felonious purpose. In the case of armed robbery, there is such a purpose, i.e., to acquire money or property belonging to another. (*People* v. *Smith, supra,* 35 Cal.3d at pp. 805-806; *People* v. *Burton* (1971) 6 Cal.3d 375, 384-388 [99 Cal.Rptr. 1, 491 P.2d 793].)

III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

VII

■ Relying on *People* v. *Dillon, supra,* 34 Cal.3d 441, appellant contends that his punishment of life imprisonment violates the prohibition of the California Constitution against cruel or unusual punishments. (Cal. Const., art. I, § 17.)

■ In this state a punishment may be unconstitutional if, "although not cruel and unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], fn. omitted.) ■ In *Lynch,* the court suggested three techniques to aid in determining proportionality. First, courts may examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. (*Id.,* at p. 425.) Second, courts may compare the challenged penalty with punishments prescribed in the same jurisdiction for different offenses which are deemed more serious. (*Id.,* at p. 426.) Third, courts may compare the challenged penalty with punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision. (*Id.,* at p. 427.)

■ When utilizing the first of those techniques, courts must consider not only the offense in the abstract, i.e., as defined by the Legislature, but also "the totality of the circumstances surrounding the commission of the offense

---

*Part III of this opinion, in which we have reconsidered this case in light of *People* v. *Barrick, supra,* 33 Cal.3d 115, is not certified for publication. (See fn., *ante,* at p. 282.)

in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) With respect to the nature of the offender, courts must ask "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

Defendant in *Dillon* was a 17-year-old high school student who was convicted of first degree felony murder after he raided a marijuana farm with six other youths, and shot and killed a guard there. The jury had expressed considerable reluctance to apply the felony-murder rule to the facts of the case, and the trial court reluctantly sentenced him to the mandatory life term in prison only after the Court of Appeal held that defendant was ineligible as a matter of law for Youth Authority commitment.

Despite the fact that defendant himself in *Dillon* shot the victim nine times, the Supreme Court held that the sentence of life imprisonment as a first degree murderer was grossly disproportionate to his individual culpability, and concluded that he should be punished as a second degree murderer. (*Id.,* at p. 489.) In its proportionality analysis, the court described the youth's state of mind during this incident as evolving from "youthful bravado, to uneasiness, to fear for his life, to panic." (*Id.,* at p. 482.) The court also emphasized testimony of a clinical psychologist that defendant was an unusually immature youth, and pointed out that he had no prior record. In addition, the court noted that both trial judge and jury believed that life imprisonment as a first degree murderer was excessive in relation to defendant's true culpability. Finally, the court compared the sentence with the "petty chastisements" handed out to the other participants in the raid, several of whom were also armed with shotguns, and all of whom were at least aiders and abettors in the killing. None of those individuals was convicted of any degree of homicide, and none was sentenced to any state prison term. (*Id.,* at p. 488.)

In contrast, in *People* v. *Laboa* (1984) 158 Cal.App.3d 115 [204 Cal.Rptr. 181] (hg. den. Sept. 20, 1984) the court applied the *Dillon* analysis and concluded that a defendant's life sentence for first degree felony murder was not grossly disproportionate to his individual culpability, even though he did not fire the fatal shot, and even though the shooting was accidental. Defendant in *Laboa* participated with several others in a nighttime robbery of an acquaintance; a codefendant accidentally shot and killed the victim; defendant was in another room at the time. Defendant was 21 years old with a prior record. The evidence established that he knowingly participated in the robbery, and that he knew stolen guns were going to be

used. His punishment was similar to that received by the other participants in the crime. The appellate court acknowledged that he may have been somewhat less culpable than the other participants, but noted that there was nothing to indicate that the jury was reluctant to convict him, or that the court believed that application of the felony-murder rule was harsh under the facts of the case. (*Id.*, at p. 122; see also *People* v. *Harpool* (1984) 155 Cal.App.3d 877 [202 Cal.Rptr. 467]; *People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1014 [204 Cal.Rptr. 271] (hg. den. Sept. 26, 1984) [". . . *Dillon*'s application of a proportionality analysis to reduce a first degree felony-murder conviction must be viewed as representing an exception rather than a general rule."].)

■ We first consider the totality of the circumstances surrounding the commission of this felony murder, including the way it was committed and the extent of appellant's involvement. The evidence indicates that the underlying robbery was a carefully planned crime, for which appellant was solely responsible. A sketch of the premises was found among his possessions. He was familiar with his victims, as he knew their home address and phone number, that they had a grandson, and certain details of their daily routine. He was armed with a revolver when he entered the shop, late in the day. He put on thin rubber gloves before handling a bag of coins. During the incident, he subjected his elderly victims to both physical and emotional abuse. He held his gun at Gertrude Wolfe's back, and forced the couple to lie, face down, on the floor. He then ordered Joseph Wolfe to crawl backward from room to room and open one safe. Next he forced the couple to kneel in the doorway of the bathroom, and made Joseph Wolfe crawl on his knees to open another safe. He threatened the couple repeatedly, and used foul language. He impliedly threatened their grandson, and told them that they were "marked," and that he had wired their apartment, presumably to blow it up. When Joseph Wolfe finally collapsed and hit his head on the wall, appellant scooped up a few more silver dollars, and then forced Gertrude Wolfe to get up, step over her husband's body, and open the front door to let him (appellant) out. Appellant's behavior throughout this incident was consistent with cold deliberation, not youthful bravado, fear, or panic.

We also consider appellant himself, in particular with regard to the degree of danger he presents to society. We have augmented the record with the probation officer's report, which was before the trial court at the time of sentencing. That report indicates that at the time of these offenses, appellant was approximately 27 years old, with a long history of criminal conduct. His juvenile record, which began when he was 15, includes a petty theft and two burglaries. His adult record began in 1971 and 1972 with convictions of tampering with an automobile, grand theft from the person of another, possession of dangerous drugs, and battery. He was committed to the

Youth Authority in 1972, escaped in September of that year, was returned to the Youth Authority in February of 1973, and was paroled in June 1974. Thereafter, he was convicted of grand theft and burglary in 1974, pled guilty to burglary and attempted burglary in 1978, and admitted a violation of probation in 1979. The probation officer concluded that appellant's participation in the instant offenses was the "unfortunate culmination of a long term pattern of anti-social and asocial and illegal behavior," and concluded that appellant represents a threat to society.

We also note that unlike the situation in *Dillon,* nothing in the record suggests that the jury in this case was reluctant to convict appellant of first degree murder, and the trial court's remarks during sentencing suggest that it did not consider application of the felony-murder rule inappropriate in this case. On the contrary, when the court explained its reasons for imposing consecutive sentences, it expressly stated that it considered appellant "a present danger to society."

In sum, on this record we find nothing which establishes that appellant's sentence is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* 8 Cal.3d at p. 424.)

We recognize that appellant declined to talk with the probation officer, and did not provide the names of any personal references. In his opposition to the motion to augment the record with the probation report, appellant's counsel suggests that he should be allowed to offer evidence on appellant's positive personal characteristics in some forum. Habeas corpus is the remedy available to a defendant when the record on appeal does not establish that a defendant's term of imprisonment is disproportionate. (See *People* v. *Wingo* (1975) 14 Cal.3d 169, 183 [121 Cal.Rptr. 97, 534 P.2d 1001].) However, we perceive nothing in appellate counsel's declaration which suggests that appellant would be able to make any showing that his personal characteristics or state of mind were such that his punishment is grossly disproportionate to his individual culpability in this case.

Judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied July 12, 1985, and appellant's petition for review by the Supreme Court was denied August 22, 1985.