[No. S033327. May 16, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT A. DAVIS, Defendant and Appellant.

COUNSEL

Francis J. Bardsley, Public Defender, under appointment by the Supreme Court, Jeffrey E. Thoma and Gary R. Nichols, Deputy Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, M. Howard Wayne, Janelle B. Davis and Pamela K. Klahn, Deputy Attorneys General, for Plaintiff and Respondent.

John J. Meehan, District Attorney (Alameda) and William M. Baldwin, Assistant District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**LUCAS, C. J.**—Penal Code section 187, subdivision (a), provides that "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (All further statutory references are to the Penal Code unless otherwise indicated.) In this case, we consider and reject the argument that viability of a fetus is an element of fetal murder under the statute. As will appear, however, we also conclude that this holding should not apply to defendant herein. Accordingly, we will affirm the judgment of the Court of Appeal.

### FACTS

On March 1, 1991, Maria Flores, who was between 23 and 25 weeks pregnant, and her 20-month-old son, Hector, went to a check-cashing store to cash her welfare check. As Flores left the store, defendant pulled a gun from the waistband of his pants and demanded the money ($378) in her purse. When she refused to hand over the purse, defendant shot her in the chest. Flores dropped Hector as she fell to the floor and defendant fled the scene.

Flores underwent surgery to save her life. Although doctors sutured small holes in the uterine wall to prevent further bleeding, no further obstetrical surgery was undertaken because of the immaturity of the fetus. The next day, the fetus was stillborn as a direct result of its mother's blood loss, low blood pressure and state of shock. Defendant was soon apprehended and charged with assaulting and robbing Flores, as well as murdering her fetus. The

prosecution charged a special circumstance of robbery-murder. (§ 190.2, subd. (a).)

At trial, the prosecution's medical experts testified the fetus's statistical chances of survival outside the womb were between 7 and 47 percent. The defense medical expert testified it was "possible for the fetus to have survived, but its chances were only 2 or 3 percent." None of the medical experts testified that survival of the fetus was "probable."

Although section 187, subdivision (a), does not expressly require a fetus be medically viable before the statute's provisions can be applied to a criminal defendant, the trial court followed several Court of Appeal decisions and instructed the jury that it must find the fetus was viable before it could find defendant guilty of murder under the statute. The trial court did not, however, give the standard viability instruction, CALJIC No. 8.10, which states that: "A viable human fetus is one who has attained such form and development of organs as to be normally capable of living outside of the uterus." The jury, however, was given an instruction that allowed it to convict defendant of murder if it found the fetus had a possibility of survival: "A fetus is viable when it has achieved the capability for independent existence; that is, when it is *possible* for it to survive the trauma of birth, although with artificial medical aid." (Italics added.)

The jury convicted defendant of murder of a fetus during the course of a robbery (§ 187, subd. (a); § 190.2, subd. (a)(17)(i)), assault with a firearm (§ 245, subd. (a)(2)) and robbery (§ 211). The jury found that, in the commission of each offense, defendant personally used a firearm. (§ 12022.5, subd. (a).) The jury found true the special circumstance allegation. Accordingly, because the prosecutor did not seek the death penalty, defendant was sentenced to life without possibility of parole, plus five years for the firearm use.

On appeal, defendant contended that the trial court prejudicially erred by not instructing the jury pursuant to CALJIC No. 8.10. He relied on United States Supreme Court decisions that have defined viability of a fetus in terms of "probabilities, not possibilities," when limiting a woman's absolute right to an abortion. (See *Roe* v. *Wade* (1973) 410 U.S. 113, 163 [35 L.Ed.2d 147, 182-183, 93 S.Ct. 705] [defining viability as that point in fetal development when a fetus, if born, would be capable of living normally outside the womb]; *Planned Parenthood* v. *Casey* (1992) __ U.S. __ [120 L.Ed.2d 674, 112 S.Ct. 2791] [reaffirming *Roe*'s viability definition].) By analogy to the abortion cases, defendant asserted that a fetus is not viable under section 187, subdivision (a), unless "there is a reasonable likelihood of [its] sustained survival outside the womb, with or without artificial support." (*Colautti* v. *Franklin* (1979) 439 U.S. 379, 388 [58 L.Ed.2d 596, 605, 99 S.Ct.

675].) Thus, defendant claimed, rather than defining viability as a "reasonable possibility of survival," the trial court should have instructed the jury under the higher "probability" threshold described in CALJIC No. 8.10.

The People argued that no viability instruction was necessary because prosecution under section 187, subdivision (a), does not require that the fetus be viable. After reviewing the wording of section 187, subdivision (a), its legislative history, the treatment of the issue in other jurisdictions, and scholarly comment on the subject, the Court of Appeal agreed with the People that contrary to prior California decisions, fetal viability is not a required element of murder under the statute. Nonetheless, the court reversed defendant's murder conviction and set aside the special circumstance finding, on the ground that application to defendant of its unprecedented interpretation of section 187, subdivision (a), would violate due process principles.

As explained below, we agree with the People and the Court of Appeal that viability is not an element of fetal murder under section 187, subdivision (a), and conclude therefore that the statute does not require an instruction on viability as a prerequisite to a murder conviction. In addition, because every prior decision that had addressed the viability issue had determined that viability of the fetus was prerequisite to a murder conviction under section 187, subdivision (a), we also agree with the Court of Appeal that application of our construction of the statute to defendant would violate due process and ex post facto principles. (*People* v. *King* (1993) 5 Cal.4th 59, 80 [19 Cal.Rptr.2d 233, 851 P.2d 27] [unforseeable enlargement of a criminal statute operates in manner of ex post facto law].) Accordingly, we address the instructional issue raised by defendant and agree with the Court of Appeal that the trial court prejudicially erred when it instructed the jury contrary to then-existing law, pursuant to a modified version of CALJIC No. 8.10. Thus, we conclude we should affirm the Court of Appeal judgment in its entirety (affirming the assault and robbery counts and reversing the judgment of murder).

DISCUSSION

I. *Historical development*

In 1970, section 187, subdivision (a), provided: "Murder is the unlawful killing of a human being, with malice aforethought." In *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], a majority of the court held that a man who had killed a fetus carried by his estranged wife could not be prosecuted for murder because the

Legislature (consistent with the common law view) probably intended the phrase "human being" to mean a person who had been born alive.

The Legislature reacted to the *Keeler* decision by amending the murder statute, section 187, subdivision (a), to include within its proscription the killing of a fetus. (Stats. 1970, ch. 1311, § 1, p. 2440.) The amended statute reads: "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) The amended statute specifically provides that it does not apply to abortions complying with the Therapeutic Abortion Act, performed by a doctor when the death of the mother was substantially certain in the absence of an abortion, or whenever the mother solicited, aided, and otherwise chose to abort the fetus. (§ 187, subd. (b).)

The legislative history of the amendment suggests the term "fetus" was deliberately left undefined after the Legislature debated whether to limit the scope of statutory application to a viable fetus. (Comment, *Is the Intentional Killing of an Unborn Child Homicide?* (1970) 2 Pacific L.J. 170, 174.) The Legislature was clearly aware that it could have limited the term "fetus" to "viable fetus," for it specifically rejected a proposed amendment that required the fetus be at least 20 weeks in gestation before the statute would apply. (Assem. Bill No. 816 (1970 Reg. Sess.).)

In 1973, the United States Supreme Court issued a decision that balanced a mother's constitutional privacy interest in her body against a state's interest in protecting fetal life, and determined that in the context of a mother's abortion decision, the state had no legitimate interest in protecting a fetus until it reached the point of viability, or when it reached the "capability of meaningful life outside the mother's womb." (*Roe* v. *Wade, supra,* 410 U.S. at p. 163 [35 L.Ed.2d at p. 183].) The court explained that "[v]iability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." (*Id.* at p. 160 [35 L.Ed.2d at p. 181].) At the point of viability, the court determined, the state may restrict abortion. (*Id.* at p. 163 [35 L.Ed.2d at pp. 182-183].)

Thereafter, in *People* v. *Smith (Karl Andrew)* (1976) 59 Cal.App.3d 751 [129 Cal.Rptr. 498] (hereafter *K.A. Smith*), the Court of Appeal construed the term "fetus" in section 187, subdivision (a), to mean a "viable fetus" as defined by *Roe* v. *Wade, supra,* 410 U.S. at pages 162-164 [35 L.Ed.2d at pages. 182-183]. In *K.A. Smith*, the defendant had beaten his wife, who was 12 to 15 weeks pregnant, saying he did not want the baby to live. The wife miscarried the fetus as a direct result of the beating. At trial, the parties stipulated that the fetus was not viable at the time of the miscarriage. (59 Cal.App.3d at pp. 753-754.)

In affirming the trial court's dismissal of the murder charge on the ground the fetus was not viable at the time of its death, the *K.A. Smith* court held that viability is an essential element of murder under section 187, subdivision (a), reasoning that "one cannot destroy independent human life prior to the time it has come into existence." (*K.A. Smith, supra,* 59 Cal.App.3d at p. 756.)

Relying on *Roe* v. *Wade, supra,* 410 U.S. 113, the *K.A. Smith* court noted a mother's constitutional right to abort the fetus during the first trimester of gestation and her qualified right to do so during the second trimester, and observed that until viability, the state has no interest in protecting the fetus from either abortion or murder. The court concluded that, "[i]mplicit in *Wade* is the conclusion that as a matter of constitutional law the destruction of a nonviable fetus is not a taking of human life. It follows that such destruction cannot constitute murder or other form of homicide, whether committed by a mother, a father . . . or a third person." (*K.A. Smith, supra,* 59 Cal.App.3d at p. 757.) The *K.A. Smith* court defined viability as " 'having attained such form and development of organs as to be normally capable of living outside the uterus.' " (*Id.* at p. 758, quoting Webster's New Internat. Dict. (3d ed. 1966) p. 2548.)

Subsequent cases also inferred a viability limitation to convicting a defendant of fetal murder under section 187, subdivision (a). In *People* v. *Apodaca* (1978) 76 Cal.App.3d 479 [142 Cal.Rptr. 830], involving an appeal from a conviction of fetal murder, the Court of Appeal rejected the defendant's contention that section 187, subdivision (a), is unconstitutionally vague because it does not specify the requisite stage of development of the fetus covered by the section. (*Apodaca, supra,* at p. 485.) The court also rejected the defendant's alternative argument that the state's power to charge a defendant with the murder of an unborn child should be limited to a fetus that is viable when it is killed. (*Id.* at p. 487.) The *Apodaca* court held that it need not reach the constitutional question whether the trial court had erred in failing to define the word "fetus" in terms of viability, because uncontroverted medical testimony had indicated during trial that the fetus was viable at the time it was murdered. (*Id.* at p. 489.)

In *People* v. *Smith (Robert Porter)* (1987) 188 Cal.App.3d 1495 [234 Cal.Rptr. 142] (hereafter *R.P. Smith*), the defendant was accused of the double murder of a woman and her fetus. Over the defendant's objection, the trial court had instructed the jury pursuant to a separate instruction submitted by the People that defined a fetus as " 'a viable unborn child.' " (*Id.* at p. 1513.) On appeal after the conviction, the defendant complained that the People's instruction failed to define the term " 'viable' " and that "without a definition of viability the jury could have interpreted the instructions to

mean that the question of viability would be [answered by facts showing] that the [fetus] was alive at the time of the killing." (*Id.* at p. 1513.) The defendant insisted that the trial court should have defined the term viable to mean an " 'unborn child . . . capable of independent existence outside the mother.' " (*Ibid.*)

The *R.P. Smith* court reviewed the earlier *K.A. Smith* and *Apodaca* decisions and concluded that the "term viable is at once simple to understand yet elusive. For this court to hold that the term viable has a common and ordinary meaning in everyday usage, we would have to take judicial notice of that fact. We must decline the invitation to do so. [¶] The trial court should have instructed the jury as to the legal definition of . . . viable. The trial judge has a sua sponte duty to instruct the jury as to all essential elements of the charged offense. [Citation.] Viability of a fetus is a constitutional prerequisite for murder of a fetus by logical extension of [*Roe*] v. *Wade, supra,* 410 U.S. 113. The trial court erred in failing to instruct the jury as to the legal meaning of the term viable." (*R.P. Smith, supra,* 188 Cal.App.3d at p. 1514.) Although the court held that the trial court erred in not instructing the jury under the "legal definition" of the term viable, it concluded the defendant had not suffered prejudice because "the record clearly demonstrate[d] the existence of the element of viability of the fetus." (*Ibid.*)

A more recent Court of Appeal decision addressing fetal murder is *People v. Henderson* (1990) 225 Cal.App.3d 1129 [275 Cal.Rptr. 837] (hereafter *Henderson*). There, the defendant argued that his second degree murder conviction for the killing of a fetus should be reversed because section 187, subdivision (a), is unconstitutionally vague. The defendant asserted that the viability requirement imposed by decisional law "is so vague that it fails to provide notice to a perpetrator that his or her violent act may be prohibited by this statute." (*Henderson, supra,* 225 Cal.App.3d at p. 1157.)

The *Henderson* court emphasized that the statute is not vague because it contains no ambiguities. In fact, the court observed, "the statute itself makes no reference whatsoever to viability. *It is decisional law interpreting section 187 which limits the criminal liability for its violation to viable fetuses.*" (*Henderson, supra,* 225 Cal.App.3d at p. 1158, italics added.) The court then determined that the definition of viability has been well established. Relying on *R.P. Smith, supra,* 188 Cal.App.3d 1495, the *Henderson* court concluded that a fetus is viable " 'when it has achieved the capability for independent existence.' " (*Henderson, supra,* 225 Cal.App.3d at p. 1157.)

This court has never directly addressed whether viability is a prerequisite to fetal murder under section 187, subdivision (a). We did, however, refuse

to consider whether an instruction on viability was sufficient in *People* v. *Hamilton* (1989) 48 Cal.3d 1142 [259 Cal.Rptr. 701, 774 P.2d 730]. There, defendant was convicted of the murder of his wife and seven-month-old fetus. The trial court combined language from *K.A. Smith*, *supra*, 59 Cal.App.3d at page 757, and *People* v. *Apodaca*, *supra*, 76 Cal.App.3d at page 487, and instructed the jury that it " 'must find beyond a reasonable doubt that the fetus was viable, that is, capable of independent existence or as having attained such form and development of organs as to be normally capable of living outside the uterus. A fetus is deemed viable when it is *possible* for it to survive the trauma of birth, although with artificial medical aid.' " (*Hamilton*, *supra*, 48 Cal.3d at p. 1171, italics added.)

On appeal, the *Hamilton* defendant contended that the trial court's instruction was contradictory and misled the jury into believing it could find him guilty of murdering a nonviable fetus. The defendant asserted that the jury should have been instructed pursuant to the United States Supreme Court's pronouncement on a woman's constitutional right to an abortion in *Roe* v. *Wade*, *supra*, 410 U.S. 113, and the subsequent definition of viability adopted by the Court of Appeal in *Colautti* v. *Franklin*, *supra*, 439 U.S. at page 388 [58 L.Ed.2d at pages 604-605], that a fetus is not viable under our murder statute unless " 'there is a reasonable likelihood of [its] sustained survival outside the womb, with or without artificial support.' " (*Hamilton*, *supra*, 48 Cal.3d at p. 1171.) We determined that we need not reach the merits of the claim, because there was uncontradicted evidence that the fetus had attained viability under any accepted test. (*Id.* at pp. 1171-1173.) Hence, we have never determined whether our Courts of Appeal have properly included viability as an element of the crime of fetal murder.

## II. *Statutory interpretation*

Defendant asserts that section 187, subdivision (a), has no application to a fetus not meeting *Roe* v. *Wade*'s definition of viability. Essentially, defendant claims that because the fetus could have been legally aborted under *Roe* v. *Wade*, *supra*, 410 U.S. at page 163 [35 L.Ed.2d at pp. 182-183], at the time it was killed, it did not attain the protection of section 187, subdivision (a). Defendant relies on *K.A. Smith*, *supra*, 59 Cal.App.3d 751, and its progeny to assert that if a fetus has not attained "independent human life" status under *Roe* v. *Wade*, *supra*, 410 U.S. at page 163 [35 L.Ed.2d at pages 182-183], it has not achieved "viability" under *K.A. Smith*, *supra*, 59 Cal.App.3d at page 759, and he therefore cannot be prosecuted under section 187, subdivision (a), for its murder.

But *Roe* v. *Wade*, *supra*, 410 U.S. 113, does not hold that the state has no legitimate interest in protecting the fetus until viability. Indeed, contrary to

the decisions in *K.A. Smith, supra,* 59 Cal.App.3d 751, *People v. Apodaca, supra,* 76 Cal.App.3d 479, *R.P. Smith, supra,* 188 Cal.App.3d 1495, and *Henderson, supra,* 225 Cal.App.3d 1129, *Roe v. Wade* principles are inapplicable to a statute (like section 187, subdivision (a)) that criminalizes the killing of a fetus without the mother's consent. As observed by one commentator: "By holding that the Fourteenth Amendment does not cover the unborn, the Supreme Court was left with only one constitutionally mandated right, that of the mother's privacy, to be considered along with the legitimate state interest in protecting an unborn's potential life. The *Roe* decision, therefore, forbids the state's protection of the unborn's interests only when these interests conflict with the constitutional rights of the prospective parent. The Court did not rule that the unborn's interests could not be recognized in situations where there was no conflict." (Parness, *Crimes Against the Unborn: Protecting and Respecting the Potentiality of Human Life* (1985) 22 Harv. J. on Legis. 97, 144.)

Other scholarly comment agrees with Professor Parness. In her article, *The Juridical Status of the Fetus: A Proposal for Legal Protection of the Unborn* (1979) 77 Mich.L.Rev. 1647, 1678, Professor King states that, "Where the protectable interests of fully mature members do not conflict with those of less mature members, there is no justification for ignoring the latter's claims. The *Roe* opinion was correct in recognizing a state's legitimate interest in protecting the previable fetus. In . . . criminal law, when that interest does not oppose a protected interest of the mature mother, the state should not hesitate to vindicate it."

Finally, as explained by Clarke Forsythe in *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms* (1987) 21 Val.U.L.Rev. 563, 616: " 'While the decision in *Roe* declares that the state may not protect the potential life of the human fetus from the moment of conception, it does so only in the very narrow context of the mother's abortion decision.' Under *Roe v. Wade,* therefore, the right to abortion is encompassed within the woman's right to constitutional privacy. The fetus is not a 'person' for purposes of the Fourteenth Amendment and has no constitutional rights that would outweigh the exercise of the woman's Fourteenth Amendment rights. The fetus' rights and the state's interest, or lack of interest, in protecting maternal health and in protecting the life of the fetus, were distinctly balanced against the woman's right to privacy in the context of consensual abortion." (Fn. omitted.) Thus, when the state's interest in protecting the life of a developing fetus is not counterbalanced against a mother's privacy right to an abortion, or other equivalent interest, the state's interest should prevail.

Other states have adopted statutes that criminalize the killing of a fetus. Although no state has criminalized the nonconsensual killing of a "fetus,"

several states criminalize the nonconsensual killing of an "unborn child," characterizing it as manslaughter or murder. In these states (Arizona, Illinois, Louisiana, Minnesota, North Dakota, and Utah), the murder statutes do not require that the unborn have reached a particular stage of development.[1]

The Illinois and Minnesota appellate courts have rejected equal protection and due process challenges to their feticide statutes. The challenges were based on the statutes' asserted failure to distinguish between viable and nonviable fetuses. As discussed below, the arguments were rejected on the ground that protection of a woman's privacy interest in the abortion context is not applicable to a nonconsensual murder of the unborn child.

In Illinois, the legislature eliminated an express viability requirement from its murder statute. The amended statute states that a "person commits the offense of intentional homicide of an unborn child" if he or she either intended to cause the death of or to do great bodily harm to the pregnant woman or her unborn child . . . [defined as "any individual of the human species from fertilization until birth]." (Ill. Rev. Stat. ch. 38, ¶ 9-1.2(b)(1) (1987).) This statute was challenged in *People* v. *Ford* (1991) 221 Ill.App.3d 354 [163 Ill.Dec. 766, 581 N.E.2d 1189, 1197], involving a defendant convicted (under the amended statute) of killing his 17-year-old stepdaughter's 5½-month-old fetus. (*Id.* at p. 1190.) The defendant contended the statute violated equal protection and due process principles because it failed to distinguish between a viable and nonviable fetus.

The Illinois Appellate Court held the statute does not violate equal protection principles because it does not affect any protectible interest held by the defendant, and it bears a rational relationship to a valid legislative purpose—protecting the "potentiality of human life." (*People* v. *Ford, supra,* 581 N.E.2d at p. 1199, quoting *Roe* v. *Wade, supra,* 410 U.S. at p. 162 [35 L.Ed.2d at p. 182].) The court observed that a defendant who intentionally murders a fetus, and a pregnant woman who chooses to terminate her pregnancy, are not similarly situated. (*People* v. *Ford, supra,* at p. 1199.) "A woman has a privacy interest in terminating her pregnancy; however, defendant has no such interest. The statute simply protects the mother and the unborn child from the intentional wrongdoing of a third party." (*Id.* at p. 1199.)

The *Ford* court also rejected the defendant's due process/vagueness challenge that the "absence of statutory definitions of when 'life' begins and

---

[1](See Ariz. Rev. Ann. Stat. § 13-1103 (A)(5) (1989) [manslaughter]; Ill. Rev. Stat. ch. 38 §§ 9-1.2, 9-2.1, 9-3.2 (1991) [murder]; Ind. Code Ann. § 35-42-1-6 (Burns 1985) [feticide]; La. Rev. Stat. Ann. §§ 14:2(7), § 14:32.5-14:32.8 (West 1986 & 1992 supp.) [feticide]; Minn. Stat. Ann. §§ 609.266, 609.2661-609.2665, 609.268(1) (1987 & 1992 supp.) [murder, manslaughter]; N.D. Cent. Code §§ 12.1-17.1-01 to 12.1-17.1-04 (1991 supp.) [murder, manslaughter]; Utah Code Ann. § 76-5-201 et seq. (1990 & 1992 supp.) [any form of homicide].)

'death' occurs will result in the trier of fact applying its subjective religious, philosophical, and political views to define those terms, thereby leading to arbitrary and discriminatory enforcement of the statute." (*People* v. *Ford, supra*, 581 N.E.2d at p. 1200.) The court found the statute constitutional on the ground that it "only requires proof that, whatever the entity within the mother's womb is called, it had life and, because of the acts of the defendant, it no longer does. The name given to that entity is irrelevant to the liability under the statute. The trier of fact will only be asked to determine whether the particular entity, whether an embryo, fetus, person, or human being, once had life and, because of the acts of the defendant, no longer does." (*Id.* at p. 1201.)

The Illinois Appellate Court relied substantially on a decision of the Minnesota Supreme Court rejecting equal protection and due process challenges to a feticide statute by a defendant who had murdered a woman and her four-week-old embryo. (*State* v. *Merrill* (Minn. 1990) 450 N.W.2d 318.) The Minnesota Legislature includes in its definition of first degree murder the killing of "an unborn child with premeditation and with intent to effect the death of the unborn child or of another." (Minn. Stat. § 609.2661(1) (1988).)

In rejecting the defendant's constitutional challenge that the homicide statute violated equal protection because an unborn child lacks "personhood" and is not a "person" under *Roe* v. *Wade, supra*, 410 U.S. at page 158 [35 L.Ed.2d at page 180], deserving protection under the Fourteenth Amendment, the Minnesota Supreme Court observed, "The focus of [*Roe*] was on protecting the woman from governmental interference or compulsion when she was deciding whether to terminate or continue her pregnancy. . . . Significantly, the *Roe* v. *Wade* court also noted that the state 'has still *another* important and legitimate interest in protecting the potentiality of human life.' . . . In our case, the fetal homicide statutes seek to protect the 'potentiality of human life,' and they do so without impinging directly or indirectly on a pregnant woman's privacy rights. [¶] The state's interest in protecting the 'potentiality of human life' includes protection of the unborn child, whether an embryo or a nonviable or viable fetus, and it protects, too, the woman's interest in her unborn child and her right to decide whether it shall be carried *in utero*. The interest of a criminal assailant in terminating a woman's pregnancy does not outweigh the woman's right to continue the pregnancy. In this context, the viability of the fetus is 'simply immaterial' to an equal protection challenge to the feticide statute. [Citation.]" (*State* v. *Merrill, supra*, 450 N.W.2d at p. 322.)

Although the Illinois and Minnesota statutes specifically state that viability is not an element to be considered for their application, both *Ford, supra*, 581 N.E.2d 1189, and *Merrill, supra*, 450 N.W.2d 318, illustrate that criminalization of the killing of a fetus without regard to viability is not violative

of either privacy principles, equal protection, or due process considerations. Both cases also illustrate that the legislature is free to impose upon the killer of a fetus the same penalty as is prescribed for the murder of a human being (although in neither state has the legislature permitted application of the death penalty for the murder of a fetus).

Like Illinois and Minnesota, California is a "code" state, i.e., the Legislature has the exclusive province to define by statute what acts constitute a crime (§ 6), and statutory provisions must "be construed according to the fair import of their terms, with a view to effect [their] objects and to promote justice" (§ 4). Under these principles, like Illinois and Minnesota, we find no impediment to our Legislature protecting the "potentiality of human life" from homicide.

Finally, both *Ford* and *Merrill* expressly distinguish fetal homicide from the abortion issue. Our Legislature does the same. Abortion is specifically exempted from section 187 under subdivision (b)(3), which states that section 187 shall not apply if "the act was solicited, aided, abetted, or consented to by the mother of the fetus."

We conclude, therefore, that when the mother's privacy interests are not at stake, the Legislature may determine whether, and at what point, it should protect life inside a mother's womb from homicide. Here, the Legislature determined that the offense of murder includes the murder of a fetus with malice aforethought. (§ 187, subd. (a).) Legislative history suggests "fetus" was left undefined in the face of divided legislative views about its meaning. (See Comment, *Is the Intentional Killing of an Unborn Child Homicide?*, supra, 2 Pacific L.J. 170, 172-175.) Generally, however, a fetus is defined as "the unborn offspring in the postembryonic period, after major structures have been outlined." (Sloane-Dorland Ann. Medical-Legal Dict. (1987) p. 281.) This period occurs in humans "seven or eight weeks after fertilization" (*ibid.*), and is a determination to be made by the trier of fact. Thus, we agree with the above cited authority that the Legislature could criminalize murder of the postembryonic product without the imposition of a viability requirement. We need not address whether different concerns might apply to an embryo. Accordingly, to the extent *K.A. Smith, supra,* 59 Cal.App.3d 751, and its progeny require a fetus to be viable in order for its murder to be prosecuted under section 187, subdivision (a), they rue the statute and should be disapproved.[2]

---

[2]We do not reach the question, and it is not raised in this case, whether the doctrine of felony murder constitutionally could be applied in the circumstance where, although the fetal stage of development has been reached, the injury resulting in the death of the fetus is caused by some agency other than a defendant's direct assault on the mother. We also do not discuss the question of premeditated murder (as opposed to felony murder) of a fetus.

III. *Due process challenge*

█ Although the Court of Appeal herein found, consistent with the foregoing analysis, that viability is not an element of fetal homicide under section 187, subdivision (a), it determined that its "redefinition" of the crime amounted to a "major change in the law" that, if applied to defendant, would violate due process principles. The Attorney General, while not conceding the point, does not address the Court of Appeal's analysis and judgment on this issue. Defendant reasserts here that if we conclude viability is not an element of fetal murder, we are bound by due process principles not to apply our decision to him. We conclude that our interpretation of section 187, subdivision (a), should apply prospectively only and not to defendant.

█ A statute " 'which makes more burdensome the punishment for a crime, after its commission,' " violates article I, section 9, clause 3, of the United States Constitution as an ex post facto determination of criminal liability (*Collins* v. *Youngblood* (1990) 497 U.S. 37, 42 [111 L.Ed.2d 30, 38-39, 110 S.Ct. 2715], quoting *Beazell* v. *Ohio* (1925) 269 U.S. 167, 169-170 [70 L.Ed. 216, 217-218, 46 S.Ct. 68]), as well as its California counterpart, article I, section 9 of the state Constitution (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282 [279 Cal.Rptr. 592, 807 P.2d 434]). Correspondingly, an unforseeable judicial enlargement of a criminal statute, applied retroactively, operates in the same manner as an ex post facto law. (*Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 354 [12 L.Ed.2d 894, 900, 84 S.Ct. 1697]; see also *People* v. *Escobar* (1992) 3 Cal.4th 740, 752 [12 Cal.Rptr.2d 586, 837 P.2d 1100]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 586 [280 Cal.Rptr. 631, 809 P.2d 290].)

Thus, holding a defendant criminally responsible for conduct that he could not reasonably anticipate would be proscribed violates due process because the law must give sufficient warning so that individuals "may conduct themselves so as to avoid that which is forbidden." (*Rose* v. *Locke* (1975) 423 U.S. 48, 50 [46 L.Ed.2d 185, 188, 96 S.Ct. 243].) ██ Defendant's ex post facto contention does not rest on a change in a statute, but on the fact that until his crime was prosecuted, the Courts of Appeal had required a showing of fetal viability before allowing a conviction under section 187, subdivision (a), to stand. (*K.A. Smith, supra,* 59 Cal.App.3d 751; *People* v. *Apodaca, supra,* 76 Cal.App.3d 479; *R.P. Smith, supra,* 188 Cal.App.3d 1459; *Henderson, supra,* 225 Cal.App.3d 1129.)

In support of his contention, defendant relies on our recent decision in *People* v. *King, supra,* 5 Cal.4th 59 (hereafter *King*), in which we held that our decision overruling *In re Culbreth* (1976) 17 Cal.3d 330, 333 [130

Cal.Rptr. 719, 551 P.2d 23], could not be applied retroactively to the *King* defendant because to do so would "make the punishments for [defendant's] crimes more burdensome after he committed them." (*King, supra,* 5 Cal.4th at p. 80.)

In *In re Culbreth, supra,* 17 Cal.3d 330, we applied section 12022.5, subdivision (a), enhancements to a defendant who had shot and killed his common law wife, mother-in-law, and brother-in-law with a rifle. Section 12022.5, subdivision (a), provides in relevant part that "any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished" as a sentence enhancement. (See, *In re Culbreth, supra,* at p. 332.) The question was whether the sentence could be enhanced for both of the murders or whether only one enhancement could be imposed for all three murders. We held, "The legislative purpose of section 12022.5 has been described as deterrence, i.e., to deter the use of firearms on subsequent occasions. . . . But if all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5 may be invoked only once and not in accordance with the number of victims." (*In re Culbreth, supra,* at pp. 333-334.)

In *King,* we overruled *In re Culbreth*'s "single-occasion" rule after concluding it had no support in the statutory language. But we also noted that *Culbreth* had been applied consistently since its pronouncement by this court, so that retroactive application would make the punishment for defendant's crimes more burdensome after he committed them. (*King, supra,* 5 Cal.4th at p. 80; *In re Baert* (1988) 205 Cal.App.3d 514, 518 [252 Cal.Rptr. 418] [refusing to apply retroactively our holding in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], which eliminated intent to kill as an element of the felony-murder special circumstance].) The same principles apply here.

As discussed above, several Courts of Appeal have erroneously implied a viability requirement into section 187, subdivision (a). Although we are not, as in *King, supra,* 5 Cal.4th 59, faced with reconsidering our own precedent, the fact that a viability requirement has consistently been read into section 187, subdivision (a), supports defendant's assertion that our proposed holding creates an unforseeable judicial enlargement of a criminal statute. (*Bouie* v. *City of Columbia, supra,* 378 U.S. at p. 353 [12 L.Ed.2d at pp. 899-900]; *Rose* v. *Locke, supra,* 23 U.S. 48.) Accordingly, we now consider whether the trial court prejudicially erred by instructing the jury pursuant to a modified instruction on viability.

IV. *Instructional error*

 Defendant requested the jury be instructed pursuant to CALJIC No. 8.10, which defines fetal murder as follows: "Every person who unlawfully kills a fetus with malice aforethought is guilty of the crime of murder in violation of Section 187 of the Penal Code. . . . [¶] In order to prove such crime, each of the following elements must be proved: [¶] 1. A viable human fetus was killed. 2. The killing was unlawful, and 3. The killing was done with malice aforethought. . . . [¶] A viable human fetus is one who has attained such form and development of organs as to be normally capable of living outside the uterus." The comment to the instruction states: "The term 'fetus' as used in Penal Code, § 187, means a viable unborn child. *People* v. [*K.A.*] *Smith*[, *supra,*] 59 Cal.App.3d 751, 758-759."

As noted above, the trial court gave instead the following modified version of CALJIC No. 8.10: "Within the meaning of Penal Code section 187, subdivision (a), as charged in Count One, a fetus is viable when it has achieved the capability for independent existence; that is, when it is *possible* for it to survive the trauma of birth, although with artificial medical aid." (Italics added.)

The Court of Appeal below assumed that the trial court's modification of CALJIC No. 8.10 was taken in part from the decision in *People* v. *Apodaca, supra,* 76 Cal.App.3d 479, where that court attempted to define viability in resolving the defendant's contention that he did not murder a viable fetus. As previously discussed, the *Apodaca* court noted that "[a] fetus is viable when it has achieved the capability for independent existence; as we have indicated, a fetus is deemed viable when it is possible for it to survive the trauma of birth, although with artificial medical aid." (*Id.* at p. 489.) Although *Apodaca* discussed viability of a fetus in a context other than instructional error, the Court of Appeal below concluded that its discussion nonetheless served as a model for the present trial court's instructional modification.

In *People* v. *Hamilton, supra,* 48 Cal.3d 1142, we reviewed an instruction substantially identical to the modified version of CALJIC No. 8.10 given here, but, as noted above, declined to decide whether the instruction as given "contained a latent but prejudicial ambiguity" because it "improperly implied that a fetus is viable if it is capable of being born alive, even if it could not have survived for a sustained period outside the mother's womb." (*Hamilton, supra,* 48 Cal.3d at p. 1171.) We determined that we "need not address the merits of defendant's claim, since the ambiguity he posits cannot have been prejudicial . . . . Uncontradicted and conclusive evidence established that the likelihood of this fetus's sustained survival was high." (*Id.* at

p. 1172.) Thus, the fetus would have been considered viable under any instruction.

As the Court of Appeal below observed, the wording of CALJIC No. 8.10, defining viability as "normally capable of living outside of the uterus," while not a model of clarity, suggests a better than even chance—a probability—that a fetus will survive if born at that particular point in time. By contrast, the instruction given below suggests a "possibility" of survival, and essentially amounts to a finding that a fetus incapable of survival outside the womb for any discernible time would nonetheless be considered "viable" within the meaning of section 187, subdivision (a). Because the instruction given by the trial court substantially lowered the viability threshold as commonly understood and accepted (as defined by *Roe* v. *Wade, supra,* 410 U.S. at pp. 162-164 [35 L.Ed.2d at pp. 182-183], *K.A. Smith, supra,* 59 Cal.App.3d at pp. 752-753, and its progeny), we conclude that the trial court erred in instructing the jury pursuant to a modified version of CALJIC No. 8.10.

The question then is whether it is reasonably probable a result more favorable to defendant would have been reached absent the instructional error. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].) The record shows the weight of the medical testimony was against the probability of the fetus being viable at the point it was killed. Defendant's medical expert opined that it was "possible" for the fetus to have survived the trauma of an early birth, but that its chances for survival were about 2 or 3 percent. Unlike *People* v. *Hamilton, supra,* 48 Cal.3d at pages 1171, in which we rejected the defendant's claim of instructional error after determining the fetus had a "better than 50 percent chance of survival" (or a *probable* chance of living outside the womb), in this case none of the medical experts who testified at defendant's trial believed that the fetus had a "probable" chance of survival. Accordingly, because the evidence on the issue of viability erroneously supported the concept of the "possibility" of survival, and the jury was then instructed that viability means "possible survival," the jury was misinformed that it could find the fetus was viable before it " 'attained such form and development of organs as to be normally capable of living outside the uterus.' " (*K.A. Smith, supra,* 59 Cal.App.3d at p. 758; CALJIC No. 8.10.) Had the jury been given CALJIC No. 8.10, it is reasonably probable it would have found the fetus not viable. We conclude, therefore, that defendant was prejudiced by the instructional error and the conviction of fetal murder must be reversed.

## CONCLUSION

We conclude that viability is not an element of fetal homicide under section 187, subdivision (a). The third party killing of a fetus with malice

aforethought is murder under section 187, subdivision (a), as long as the state can show that the fetus has progressed beyond the embryonic stage of seven to eight weeks.

We also conclude that our holding should not apply to defendant and that the trial court committed prejudicial error by instructing the jury pursuant to a modified version of CALJIC No. 8.10. We therefore affirm the judgment of the Court of Appeal.[3]

Arabian, J., concurred.

**KENNARD, J.,** Concurring.—California law defines murder as the "unlawful killing of a human being, *or a fetus*, with malice aforethought." (Pen. Code, § 187, subd. (a), italics added; all unlabeled statutory references are to this code.) The issue here is whether a person who kills a nonviable fetus, that is, a fetus incapable of sustained life outside the womb, may be convicted of murder. ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ The lead opinion concludes that the Legislature did not make viability an element of fetal murder, and that the federal Constitution does not prohibit a state from making criminal the unlawful killing of a nonviable fetus. (Lead opn., *ante*, pp. 809-810.) I agree. I write separately, however, to address some points made by the dissent, and to expand on the lead opinion's discussion of the United States Supreme Court's decision in *Roe v. Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705].

According to the dissent, our Legislature intended to restrict the crime of fetal murder to cases in which the fetus was viable. I am persuaded, however, that this was not the Legislature's intent. The strongest evidence of legislative intent is the language used in the statute. In plain and simple terms, section 187, subdivision (a), states: "Murder is the unlawful killing of . . . a fetus, with malice aforethought." There is not a single reference in the statute to the term "viability." Nothing in the scant legislative history of the enactment persuades me that the Legislature intended a viability requirement.

Unlike the dissent, I attach no significance to the Legislature's failure to rewrite the fetal murder statute in the wake of certain decisions by the Courts of Appeal that have read a viability requirement into the statute. I do not

[3]Because of the multiple opinions in this case, we believe it appropriate to observe that a majority of the court concurs in our determinations that (1) viability of a fetus is not an element of fetal murder under section 187, subdivision (a), (2) the instruction defining viability in terms of mere "possibility" of survival amounted to prejudicial error under ex post facto principles, and (3) the Court of Appeal judgment reversing the conviction of murder must be affirmed.

share the dissent's view that the Legislature must have agreed with these decisions, or it would have amended section 187 to eliminate viability as an element of fetal murder. Legislative inaction would signify "legislative acquiescence" only if, by taking action, the Legislature could have undone the rule adopted by the Courts of Appeal. But here the Legislature could not undo the requirement of viability that the first of these decisions read into the fetal murder statute "as a matter of constitutional law." (*People* v. *Smith* (1976) 59 Cal.App.3d 751, 757 [129 Cal.Rptr. 498].) Faced with that appellate authority, the Legislature's inaction proves nothing more than its recognition that, under California case law, enforcement of section 187, subdivision (a), against someone who had killed a nonviable fetus would be unconstitutional.

When the appellate court in *Smith, supra,* 59 Cal.App.3d 751, read a constitutional requirement of viability into the fetal murder statute, it did so in mistaken reliance on *Roe* v. *Wade, supra,* 410 U.S. 113. It appears that the Court of Appeal confused the issue of state authority to interfere with a woman's procreative choice with the quite distinct issue of state authority to punish a third party whose violent conduct against the pregnant woman deprives her of that choice. Although in *Roe* the concept of "fetal viability" was critical to the first of the two issues, it has no application to California's fetal murder statute, as I shall explain.

In *Roe* v. *Wade, supra,* 410 U.S. 113, the high court affirmed the principle that the guarantee of personal privacy embodied in the federal Constitution protected those personal rights—such as intimate decisions of procreation— that "can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'" (*Id.* at pp. 152-153 [35 L.Ed.2d at pp. 176-177].) That federal guarantee of personal privacy, the court stated, was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." (*Id.* at p. 153 [35 L.Ed.2d at p. 177].) Measured against a woman's right to choose to terminate her pregnancy, any state interest in protecting the potential life of an unborn fetus would be sufficiently compelling only at the point of fetal viability—that is, when the fetus is "potentially able to live outside the mother's womb, albeit with artificial aid." (*Id.* at pp. 160, 163 [35 L.Ed.2d at pp. 181, 182-193].) Only at that stage may the state interfere with the pregnant woman's fundamental right to choose to have an abortion. Because "fetal viability" delineates the point at which a state may constitutionally prohibit abortion, that concept was central to the high court's decision in *Roe.*

But when, as here, a violent assault on a pregnant woman results in the killing of the fetus she carries, the state's power to criminalize the act as

murder does not depend on "fetal viability."[1] Because, unlike the situation in *Roe* v. *Wade*, *supra*, 410 U.S. 113, there is no competing constitutionally protected interest at stake, the state's decision to criminalize the conduct can be justified even if the state does not have a compelling interest in protecting potential human life. Moreover, when a fetus dies as the result of a criminal assault on a pregnant woman, the state's interest extends beyond the protection of potential human life. The state has an interest in punishing violent conduct that deprives a pregnant woman of her procreative choice.

For the reasons given above, I join the lead opinion in concluding that, to constitute fetal murder under section 187, subdivision (a), the fetus need not be viable.

The dissent raises an important concern when it points out that the lead opinion's interpretation of the statute could result in the death penalty for a defendant who lacks any intent to kill but whose conduct while committing a felony inadvertently causes a woman, early in her pregnancy, to miscarry. (Dis. opn., *post*, p. 838.) This anomalous result is largely attributable to our felony-murder rule. Under that rule, even an accidental killing committed during the perpetration of certain specified felonies is first degree murder. (§ 189.) The dissent's hypothetical scenario does illustrate, however, that a person who committed one of the specified felonies, and was unaware that a woman present during that felony was pregnant could, by causing the woman to miscarry, be subject to the death penalty. In some such cases a penalty of death, or even life imprisonment without the possibility of parole, may be wholly disproportionate to the particular defendant's criminal culpability, and thus may violate constitutional proscriptions against cruel and unusual punishment. (U.S. Const., 8th Amend.; *Tison* v. *Arizona* (1987) 481 U.S. 137, 157 [95 L.Ed.2d 127, 144, 107 S.Ct. 1676]; *Coker* v. *Georgia* (1977) 433 U.S. 584, 592 [53 L.Ed.2d 982, 989, 97 S.Ct. 2861]; Cal. Const., art. I, § 17; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477 [194 Cal.Rptr. 390, 668 P.2d 697].)

The sentence of life without possibility of parole imposed by the court in this case is not wholly disproportionate to the defendant's criminal culpability. The defendant shot a young woman in the chest at point blank range while trying to rob her, conduct which is highly likely to result in a fatality. It was only fortuitous that defendant's conduct did not result in the death of the woman along with the fetus she carried. On these facts, the sentence of life without parole is not cruel and unusual punishment.

---

[1]When a pregnancy is terminated by a physician or surgeon for medical necessity or at the request or with the consent of the pregnant woman, the criminal prohibition of section 187, subdivision (a), does not apply. (§ 187, subd. (b)(2) & (b)(3).)

Even though defendant's criminal act and its tragic consequences warrant substantial punishment, his conviction for first degree murder and the special circumstances finding must be reversed for the reasons set forth in the lead opinion.

For all of these reasons, I concur in the lead opinion.

Stone (S. J.), J.,* concurred.

**BAXTER, J.,** Concurring and Dissenting.—Had the trial court in this case given an instruction that a fetus need not be viable under Penal Code section 187, subdivision (a) (hereafter section 187(a)), or had the law in California been settled that, for purposes of section 187(a), a viable fetus meant a fetus with a "probability" or a "reasonable likelihood" of survival outside the womb, then I would not hesitate in joining the lead opinion to reverse defendant's conviction. As it stands, however, neither is the case. ▮ Therefore, while I concur in the holding that viability of a fetus is not required under section 187(a), I must dissent from the decision to reverse.

As the lead opinion points out, the trial court below instructed the jury that to find defendant guilty of fetal murder under section 187(a), it must find that the fetus was viable. Inasmuch as our decision today holds that fetal viability is not a requirement of section 187(a), the instruction given inured to defendant's benefit.

The trial court further instructed: "A fetus is viable when it has achieved the capability for independent existence; that is, when it is *possible* for it to survive the trauma of birth, although with artificial medical aid."[1] (Italics added.) Although fetal viability is not even a requirement under section 187(a), the lead opinion finds that the court prejudicially erred in defining viability in terms of "possible" survival, and overturns defendant's conviction.

This approach makes no sense. In finding that this definitional instruction was in error, the lead opinion is purporting to decide an issue that was unsettled both at the time defendant acted and at the time of his trial. (See *post,* pp. 819-821.) In effect, the lead opinion wanders into a wonderland to

*Presiding Justice, Court of Appeal, Second District, Division Six, assigned by the Acting Chairperson of the Judicial Council.

[1] In addition, the trial court instructed the jury that "[s]urviving the trauma of birth does not mean momentary survival, but requires survival at least through the 28 day neonatal period." Therefore, the instructions as a whole did not, as the lead opinion suggests, tell the jury that a fetus with a possibility of survival could refer to "a fetus incapable of survival outside the womb for any discernible time." (Lead opn., *ante,* p. 814.)

decide what the law might be had it not been for today's holding rejecting the viability limitation.

Rather than venture into a fictitious world, I believe we should focus on whether defendant's due process rights were violated by the giving of an instruction that defined viability in terms of possible survival. Since the unsettled status of previous case law precludes any determination whether the trial court's instructions constituted error, we should instead look to whether the trial court's reliance on the challenged definition was an unforeseeable judicial enlargement of section 187(a). (See *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 353 [12 L.Ed.2d 894, 899-900, 84 S.Ct. 1697].) I conclude it was not.

There are at least three reasons why the trial court's definition of viability did not amount to an unforeseeable judicial enlargement of the fetal murder statute. *First,* although at the time defendant acted some Courts of Appeal had inferred a viability limitation to section 187(a), none had directly addressed whether a viable fetus means a fetus with a probability or a reasonable likelihood of survival outside the womb, as opposed to one with only a possibility of survival (i.e., *People* v. *Smith (K.A.)* (1976) 59 Cal.App.3d 751 [129 Cal.Rptr. 498] [hereafter *K.A. Smith*]; *People* v. *Apodaca* (1978) 76 Cal.App.3d 479 [142 Cal.Rptr. 830] [hereafter *Apodaca*]; *People* v. *Smith (R.P.)* (1987) 188 Cal.App.3d 1495 [234 Cal.Rptr. 142] [hereafter *R.P. Smith*]; *People* v. *Henderson* (1990) 225 Cal.App.3d 1129 [275 Cal.Rptr. 837] [hereafter *Henderson*]). *Second,* two courts had expressed the view that a viable fetus means one that has a possibility of survival (see *Apodaca, supra,* 76 Cal.App.3d at p. 489; *Henderson, supra,* 225 Cal.App.3d at pp. 1157-1158). *Third,* this court indicated in 1989—two years before the conduct in this case was undertaken—that we would consider the propriety of an instruction implying that a fetus is deemed viable when it is possible for it to survive if and when we were faced with a case involving a fetus with less than a 50 percent likelihood of survival (see *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1171-1172 [259 Cal.Rptr. 701, 774 P.2d 730] [hereafter *Hamilton*]). Thus, the definition of viability was an open question in California.

As indicated above, two Courts of Appeal, like the trial court below, posited that a viable fetus means a fetus that has a possibility of survival (see *Apodaca, supra,* 76 Cal.App.3d at p. 489 [Fifth App. Dist.];[2] *Henderson, supra,* 225 Cal.App.3d at pp. 1157-1158 [First App. Dist., Div. Three], citing

---

[2]The precise statement in *Apodaca* was: "A fetus is viable when it has achieved the capability for independent existence; . . . a fetus is deemed viable when it is *possible* for it to survive the trauma of birth, although with artificial medical aid." (76 Cal.App.3d at p. 489,

*Apodaca),* as contrasted to a fetus that has a probability or a reasonable likelihood of survival.

It is likely that the court in *Apodaca, supra,* 76 Cal.App.3d 479, spoke in terms of possible survival because *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705] referred to viability as the time when a fetus is "potentially able" to live outside the womb, albeit with artificial aid, and has "capability of meaningful life." (See 410 U.S. at pp. 160, 163 [35 L.Ed.2d at pp. 181-182].) However, after *Apodaca, supra,* the United States Supreme Court, purporting to reiterate its previous view, stated that viability, or capability of meaningful life, was reached when in the judgment of the pregnant woman's attending physician, "there is a *reasonable likelihood* of the fetus' [*sic*] sustained survival outside the womb, with or without artificial support." (*Colautti* v. *Franklin* (1979) 439 U.S. 379, 388 [58 L.Ed.2d 596, 605, 99 S.Ct. 675], italics added [hereafter *Colautti*].) Subsequently, *Henderson, supra,* 225 Cal.App.3d 1129, held that section 187(a) was not unconstitutionally vague and therefore did not violate due process principles. In recognizing that the concept of viability was well established in the context of section 187, *Henderson* cited to the *Apodaca* definition of viability. (*Henderson, supra,* 225 Cal.App.3d at pp. 1157-1158.) Although *Henderson* did not specifically address the reasonable likelihood language referred to in *Colautti,* it did conclude that *Colautti* had no application to the construction of section 187(a) (225 Cal.App.3d at p. 1158.)

Taken as a whole, these decisions indicate that, even though a fetus must have a reasonable likelihood of sustained survival outside the womb for purposes of various abortion issues, a fetus must simply have a possibility of survival for purposes of California's fetal murder statute.[3] *Apodaca* and *Henderson* thus put defendant on sufficient notice that even with an implied

italics added.) Strictly speaking, however, this statement appears to be dicta—the court did not reach the question whether the trial court had erred in failing to define the word "fetus" in terms of viability because uncontroverted medical testimony had indicated during trial that the fetus was viable at the time it was murdered. Furthermore, while the court gave its definition of viability in the context of holding that the determination of fetal viability is dependent upon the peculiar circumstances of each case, it did not address the possibility/probability distinction.

[3]It is unclear whether the other Court of Appeal decisions are inconsistent with *Apodaca* and *Henderson. K.A. Smith, supra,* 59 Cal.App.3d 751, an early case in which it was stipulated that the subject fetus was nonviable (*id.,* at p. 754), simply held that the destruction of a nonviable fetus could not constitute murder under section 187(a) (59 Cal.App.3d at pp. 756-757). However, in rejecting the Attorney General's argument that the concept of viability was too vague to be serviceable, the court in *K.A. Smith* stated that the definition of viability was well established, meaning " 'having attained such form and development of organs as to be normally capable of living outside the uterus.' " (*Id.,* at p. 758, citing Webster's New Internat. Dict. (3d ed. 1966) p. 2548.) The court, however, had not been asked to address the possibility/probability distinction. *R.P. Smith, supra,* 188 Cal.App.3d 1495, also did not

viability limitation, some California courts were of the view that section 187(a) proscribed the unlawful killing of fetuses having only a possibility of survival. Defendant could therefore reasonably anticipate that his conduct would be proscribed. (See *Rose v. Locke* (1975) 423 U.S. 48, 50 [46 L.Ed.2d 185, 188, 96 S.Ct. 243].)

Our statements in *Hamilton, supra,* 48 Cal.3d 1142, provide yet another reason for finding against defendant on the due process issue. In *Hamilton,* a defendant contended that the trial court gave a jury instruction that improperly implied that a fetus is viable if capable of being born alive, even if it could not have survived for a sustained period outside the mother's womb. In fact, it appears that the allegedly erroneous instruction in *Hamilton* was based in part on the "possibility" language of *Apodaca, supra,* 76 Cal.App.3d at page 489, and that the defendant had specifically argued that the instruction was contrary to *Colautti, supra,* 439 U.S. at page 388 [58 L.Ed.2d at p. 605]. (*Hamilton, supra,* 48 Cal.3d at p. 1171.) Although we expressly declined to address the defendant's claim on the merits because there was uncontroverted evidence that the subject fetus had attained viability under any test, we noted: "The 1970 amendment extending murder to fetuses (§ 187, subd. (a); Stats. 1970, ch. 1311, § 1, p. 2440) contained no viability proviso. As amended, section 187, subdivision (a) simply defines murder as 'the unlawful killing of a human being, or a fetus, with malice aforethought.' The Courts of Appeal have inferred a viability limitation in light of the subsequent abortion cases, which first recognized a woman's constitutional right to terminate her pregnancy before the fetus becomes viable. (See, e.g., *Smith, supra,* 59 Cal.App.3d at pp. 756-757.)" (*Id.,* at pp. 1171-1172, fn. 18.) *Hamilton* thus highlighted the fact that we did not accept or approve of the implied viability limitation, and signaled our intent to address both this issue and the possibility/probability issue if and when presented with the type of facts involved here.

Affirmance of defendant's conviction is fully consistent with our decision in *People v. King* (1993) 5 Cal.4th 59 [19 Cal.Rptr.2d 233, 851 P.2d 27], which, as the majority points out, overruled *In re Culbreth* (1976) 17 Cal 3d 330 [130 Cal. Rptr. 719, 551 P.2d 23] (hereafter *Culbreth*). In *People v. King, supra,* 5 Cal.4th 59, the Attorney General argued that our overruling of *Culbreth* should apply to the defendant because the plain words of the subject statute, together with explicit criticisms of *Culbreth* by various Courts of Appeal, gave fair warning that we might reconsider our stated position. (5 Cal.4th at pp. 79-81.) We rejected the argument, observing: "The mere possibility that this court might reconsider its own precedent is not the equivalent of actually overruling it." (*Id.,* at p. 80.)

specifically discuss the possibility/probability issue, but did seem to equate the term "viability" with "85 percent chance to survive independent of the womb." (*Id.,* at p. 1516.)

The situation before us is clearly distinguishable. The challenged jury instruction defining viability in terms of "possible" survival is grounded in the language of two appellate decisions. Prior to the time defendant acted, no appellate court in California had ever held that for purposes of section 187(a), viability means a probability or reasonable likelihood of survival. Finally, *Hamilton, supra,* 48 Cal.3d at pages 1171-1172, gave ample warning to defendant that we would consider the possibility/probability issue in a case presenting the appropriate facts.

Under these circumstances, defendant cannot credibly claim that the jury instructions given in this case represented an unforeseeable judicial enlargement of section 187(a). Accordingly, defendant's due process rights were not violated by their use.

I would affirm the conviction.

George, J., concurred.

**MOSK, J.**—I dissent. I believe the Legislature intended the term "fetus" in its 1970 amendment to Penal Code section 187 to mean a *viable* fetus. I rest this belief on a number of grounds.

I

First, " 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' " (*People* v. *Thomas* (1992) 4 Cal.4th 206, 210 [14 Cal.Rptr.2d 174, 841 P.2d 159].) Among the relevant evidence of that intent are "Both the legislative history of the statute and the wider historical circumstances of its enactment . . . ." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Here the legislative history of the 1970 amendment to Penal Code section 187 (all unlabeled statutory references are to this code) was unusual, even dramatic. On Friday, June 12, 1970, we filed our decision in *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420] (hereafter *Keeler*), holding that the Legislature did not intend that a viable fetus be deemed a "human being" within the meaning of section 187. On the very next working day—Monday, June 15—the decision was publicly denounced by the majority floor leader of the Assembly. (See Comment, *Is the Intentional Killing of an Unborn Child Homicide?* (1971) 2 Pacific L.J. 170, 172 & fn. 13 [hereafter Comment, *Killing of an Unborn Child*].) Although the legislative session was more than halfway over and the

deadline for introducing new bills had long since passed, the majority leader nevertheless took immediate action to permit the Legislature to overrule *Keeler*: a fellow legislator relinquished sponsorship of a pending bill on a wholly different subject—Assembly Bill No. 816—and on June 24 the majority leader "amended" that bill by deleting its original text in its entirety and replacing it with his new version of section 187. In quick succession the bill was then amended twice more in the Assembly (July 10 & 17), passed and sent to the Senate (July 27), amended in the Senate (Aug. 7), and passed and returned to the Assembly (Aug. 20), where the Senate amendments were concurred in the next day (Aug. 21). In short, the bill was passed in both houses, after multiple amendments and appropriate committee hearings in each house, in the space of barely eight weeks. And the effort had been successful: despite the evolution of its wording, the bill's author "was convinced that it would accomplish his original intent, that is, to make Robert Keeler's actions susceptible to a charge of murder." (Comment, *Killing of an Unborn Child, supra*, 2 Pacific L.J. at p. 175, fn. omitted.)

To determine the Legislature's intent, therefore, we need to understand precisely what were (1) "Robert Keeler's actions" and (2) this court's response to them. It is black letter law that the holding of a case is determined " 'by taking account (a) of the facts treated by the judge as material, and (b) his decision as based on them.' " (*Achen* v. *Pepsi-Cola Bottling Co.* (1951) 105 Cal.App.2d 113, 124 [233 P.2d 74].)

The material facts of *Keeler, supra*, 2 Cal.3d 619, were essentially undisputed. When Robert and Teresa Keeler were granted an interlocutory decree of divorce on September 27, 1968, Teresa was already pregnant by one Ernest Vogt. She began living with Vogt in a different city and concealed the fact from Robert. Under the decree of divorce Robert had custody of their two daughters, but Teresa had the right to take the girls on alternate weekends. Five months later, on February 23, 1969, Robert encountered Teresa driving on a rural road after delivering the girls to their home. He said to her, "I hear you're pregnant. If you are you had better stay away from the girls and from here." (*Id.* at p. 623.) When Teresa got out of her car Robert looked at her abdomen and became "extremely upset." Saying, "You sure are. I'm going to stomp it out of you," he struck her in the face and pushed his knee into her abdomen. When doctors subsequently performed a Caesarean section on Teresa the fetus was delivered stillborn. The pathologist was of the opinion that the fetus's fatal injury—a skull fracture—could have been caused by a blow to Teresa's abdomen.

At the time of delivery the fetus weighed five pounds and was eighteen inches in length. In light of these facts Teresa's obstetrician estimated the

fetus was 35 weeks old. An attending pediatrician likewise estimated the age of the fetus as between 34½ and 36 weeks. The expert testimony thus "concluded 'with reasonable medical certainty' that the fetus had developed to the stage of viability, i.e., that in the event of premature birth on the date in question it would have had a 75 percent to 96 percent chance of survival." (*Keeler, supra,* 2 Cal.3d at p. 624.)

The majority opinion in *Keeler,* which I authored for the court, demonstrates the materiality of the fact that the fetus was viable by repeatedly incorporating that fact into its legal analyses and conclusions. At the outset we stated that the issue before the court was "whether an unborn but *viable* fetus is a 'human being' within the meaning of [§ 187]," and concluded that "the Legislature did not intend such a meaning" because the common law had always required a live birth to support a charge of murder. (2 Cal.3d at p. 623, italics added.)

Thereafter the People sharply focused our attention on the importance of viability. The People contended that the common law requirement of live birth was no longer an appropriate test of what is a human being because in modern medicine a fetus born after 28 weeks or more of gestation "has an excellent chance of survival, i.e., is 'viable' "; that an "unborn but viable" fetus is now fully capable of independent life; and that one who unlawfully terminates "such a life" should be prosecuted under section 187. (2 Cal.3d at p. 631.) In response, we did not deny that such fetuses were now viable, but held on two grounds that Robert Keeler could not be prosecuted for murder by reason of his alleged act of killing "an unborn—even though viable—fetus." (*Ibid.*)

The first ground was our reluctance to rewrite the murder statute to extend it to this new class of victims. We recognized (2 Cal.3d at p. 632) that the killing of an "unborn but viable" fetus may be deemed an offense as grave as common law murder, but reasoned that to thus extend liability for murder was a matter solely for the Legislature: "For a court to simply declare, by judicial fiat, that the time has now come to prosecute under section 187 one who kills an unborn but viable fetus would indeed be to rewrite the statute under the guise of construing it." (*Id.* at p. 633, italics added.)

The second ground was our perception of a due process bar to the charge because Robert Keeler had no notice of such a judicial enlargement of the crime of murder. We found no California case giving him notice that the killing of an "unborn but viable" fetus was covered by section 187. (2 Cal.3d at p. 636.) We distinguished *People* v. *Chavez* (1947) 77 Cal.App.2d 621 [176 P.2d 92], on the ground that it did not hold that "a fetus, however

viable," that was not in the process of being born was a human being under section 187. (2 Cal.3d at p. 637.) And we also distinguished civil law rules protecting the property interests of an unborn child provided it is subsequently born alive, explaining why such rules did not give Robert Keeler notice that the killing of an "unborn but viable" fetus would now be murder. (*Id.* at p. 639.)

The dissenting opinion of Acting Chief Justice Burke in *Keeler* (2 Cal.3d at p. 639) likewise tied its analysis and conclusions closely to the fact of viability. Thus it began by stressing the evidence that the fetus in question "had reached the 35th week of development, had a 96 percent chance of survival, and was 'definitely' alive and viable" at the time of death. (*Id.* at pp. 639-640.) The dissent then marshaled a number of arguments in support of its conclusion that such a viable fetus was a human being under section 187.

First, the dissent argued there is common law precedent to support the view that "a viable fetus such as a Baby Girl Vogt [i.e., Teresa Keeler's baby]" is a "human being" under the California homicide statutes. (2 Cal.3d at p. 640.) The dissent noted that the common law severely punished abortion after "quickening," i.e., the time when the fetus is first felt to move in the womb, and reasoned that "we cannot assume that the Legislature intended a person such as defendant, charged with the malicious slaying of a *fully viable* child, to suffer only the mild penalties imposed upon common abortionists who, ordinarily, procure only the miscarriage of a *nonviable* fetus or embryo." (*Id.* at p. 641, italics added.) The dissent then disclaimed any suggestion, however, that "human being" in section 187 should be defined in terms of the outdated concept of quickening: "The analogous concept of viability is clearly more satisfactory, for it has a well defined and medically determinable meaning denoting the ability of the fetus to live or survive apart from its mother." (2 Cal.3d at p. 641, fn. omitted.)

Next the dissent argued that its view would not judicially create a new offense because the Legislature intended that the term "human being" in section 187 be construed as an evolving concept to be defined by the courts according to contemporary conditions. Noting that under those conditions the *Keeler* fetus would have had a 98.8 percent chance of survival, the dissent urged that the term "human being" in section 187 should include "the fully viable fetus." (2 Cal.3d at p. 643.)

The dissent also rejected the majority's due process ground, asking rhetorically, "Can defendant really claim surprise that a 5-pound, 18-inch, 34-week-old, living, *viable* child is considered to be a human being?" (2

Cal.3d at p. 644, italics added.) In view of the decision in *People* v. *Chavez, supra,* 77 Cal.App.2d 621, the dissent found that "defendant had sufficient notice that the words 'human being' could include a *viable* fetus." (2 Cal.3d at p. 645, italics added.)

In sum, the dissent concluded, "There is no good reason why a *fully viable* fetus should not be considered a 'human being' under [§ 187]." (2 Cal.3d at p. 645, italics added.)

It was thus obvious to any reader of *Keeler* in 1970, as it is obvious today, that the case held that the Legislature did not intend that Robert Keeler's act of maliciously killing an "unborn but viable" fetus be prosecuted as murder under section 187. That was the holding that motivated the Legislature to act with such unusual speed upon publication of the *Keeler* opinions, and it was also the holding that Assembly Bill No. 816 was intended to, and did, overrule: "[Section] 187 was amended in 1970 to nullify the *Keeler* holding." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 450, p. 507.) It follows that by enacting the 1970 amendment to section 187 the Legislature extended the crime of murder, as *Keeler* refused to do, to include the malicious killing of a *viable* fetus. To read that amendment as further extending murder to include the killing of even a *nonviable* fetus, as the lead opinion does now, is to ignore the facts and holding of *Keeler* and the direct legislative response they so plainly triggered.

II

Another rule of statutory construction supports this conclusion.

The first case to construe the 1970 amendment to section 187 was *People* v. *Smith* (*Karl Andrew*) (1976) 59 Cal.App.3d 751 [129 Cal.Rptr. 498] (hereafter *K.A. Smith*). There, as in *Keeler, supra,* 2 Cal.3d 619, the defendant assaulted a pregnant woman with the specific intent of terminating her pregnancy, and caused her to miscarry; the difference was that the woman was only 12 to 15 weeks pregnant at the time. "It was stipulated that the product of conception was nonviable." (59 Cal.App.3d at p. 754.) The trial court ruled that only a viable fetus could be an object of murder under the 1970 amendment, and therefore dismissed a murder charge. On the People's appeal the Court of Appeal affirmed the ruling, and we denied review. The Court of Appeal devoted its entire opinion to the issue; although its rationale

differed from my reasoning herein,[1] the Court of Appeal squarely held that "we construe the word 'fetus' in section 187 to refer to a viable unborn child." (*Id.* at p. 759.) This construction was incorporated into the approved jury instruction defining fetal murder, which declares that the killing of "a viable human fetus" is an element of the crime and defines such viability. (CALJIC No. 8.10 (5th ed. 1988).)

All subsequent cases involving fetal murder in this state have likewise held or assumed that viability is an element of the crime. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1171-1173 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Henderson* (1990) 225 Cal.App.3d 1129, 1157 [275 Cal.Rptr. 837] ["The 'fetus' described in the statute means only a 'viable' fetus."]; *People* v. *Smith* (*Robert Porter*) (1987) 188 Cal.App.3d 1495, 1512-1516 [234 Cal.Rptr. 142]; *People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 487-490 [142 Cal.Rptr. 830].)

The lead opinion reviews the cases just cited, but overlooks *People* v. *Bunyard* (1988) 45 Cal.3d 1189 [249 Cal.Rptr. 71, 756 P.2d 795]. There the defendant was convicted of double murder when he hired another to kill his wife, knowing she was pregnant. As in *Keeler, supra*, 2 Cal.3d 619, the fetus was undoubtedly viable at the time—indeed, it was full term; there was thus no issue as to whether viability was an element of fetal murder under section 187. Yet the court plainly implied that it was an element of that crime: also as in *Keeler*, our opinion in *Bunyard*[2] repeatedly incorporated the fact of the fetus's viability into its legal analyses and conclusions. For example, in rejecting a contention that the multiple-murder special-circumstance statute (§ 190.2, subd. (a)(3)) is ambiguous because it does not expressly refer to the murder of "a fetus" as does section 187, we said that when the two statutes are read together it is clear that the special circumstance applies to the killing, even by a single act, "of a pregnant woman and her *viable* fetus." (45 Cal.3d at pp. 1237-1238, italics added, fn. omitted; see also *id.* at p. 1239.) We next rejected a contention that to make the defendant death-eligible because of the murder of a fetus would violate the state cruel or unusual punishment clause. (Cal. Const., art. I, § 17.) We explained that "The fact

---

[1] The court's principal rationale (59 Cal.App.3d at p. 757) was that "Implicit in [*Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705)] is the conclusion that as a matter of constitutional law the destruction of a nonviable fetus [i.e., by abortion] is not a taking of human life. It follows that such destruction cannot constitute murder or other form of homicide, whether committed by a mother, a father (as here), or a third person." I agree with the lead opinion's critique of that rationale (lead opn., *ante*, pp. 803-810, but the critique is irrelevant to the point I make here.

[2] The opinion was authored by Justice Arguelles and joined in by five justices, including the Chief Justice and Justices Panelli and Eagleson; Justice Kaufman concurred fully in the portions of the opinion quoted hereafter.

that the victim murdered is an unborn child does not render defendant less culpable, or the crime less severe, in light of *the Legislature's determination that viable fetuses receive the same protection under the murder statute as persons*." (45 Cal.3d at p. 1240, italics added.) We then rejected an Eighth Amendment claim on the ground, inter alia, that the defendant failed to show arbitrariness in charging practices or sentencing decisions "with respect to the imposition of the death penalty for the murder of a pregnant woman and her *viable* fetus." (*Ibid.*, italics added.) Finally, we found unpersuasive the defendant's argument that California is one of only three states in which an accompanying feticide can raise a noncapital murder of a pregnant woman to capital status. We explained that the argument fails to consider the distinction that, unlike section 187, the laws of most other jurisdictions do not "make the unlawful killing of a *viable* fetus a homicide, or a murder, at all." (45 Cal.3d at p. 1241, italics added.)

The lead opinion correctly asserts that until the case at bar "every prior decision that had addressed the viability issue had determined that viability of the fetus was prerequisite to a murder conviction under section 187, subdivision (a)" (lead opn., *ante*, p. 802). The lead opinion invokes this fact to support its conclusion that to apply its new and contrary construction of section 187 to this defendant would violate his due process and ex post facto rights. But the fact also leads logically to another and equally compelling conclusion. Since the decision in *K.A. Smith, supra*, 59 Cal.App.3d 751, holding that viability is an element of fetal murder under section 187, the Legislature has met 18 times but has taken no step to overrule that holding by what would be a simple amendment to the statute.

The Legislature well knows how to delete statutory elements added by judicial construction, particularly on the topic of murder. For example, section 187 defines murder as a killing with malice, and section 188 provides statutory definitions of both express and implied malice. In *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911] (hereafter *Conley*), this court declared that "An awareness of the obligation to act within the general body of laws regulating society . . . is included in the statutory definition" of both kinds of malice. This construction of section 188 was consistently followed by our courts (see, e.g., *People* v. *Sedeno* (1974) 10 Cal.3d 703, 723 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 758 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Carpenter* (1979) 99 Cal.App.3d 527, 533-534 [160 Cal.Rptr. 386]; *People* v. *Fusselman* (1975) 46 Cal.App.3d 289, 303 [120 Cal.Rptr. 282]), and was incorporated into the approved jury instructions (CALJIC No. 8.11 (4th ed. 1979)). In 1981, however, the Legislature expressly repudiated the *Conley* construction by adding a sentence to section 188 declaring that "An awareness of the obligation to act within the general body of laws regulating

society is *not* included within the definition of malice." (Stats. 1981, ch. 404, § 6, p. 1593, italics added; see *People* v. *Saille* (1991) 54 Cal.3d 1103, 1113-1114 [2 Cal.Rptr.2d 364, 820 P.2d 588].)[3]

I recognize that "Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval" (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1127 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]), and that the presumption of such acquiescence "is not conclusive in determining legislative intent" (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873]). But in appropriate circumstances it may at least be persuasive. For example, in the recent case of *Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 831 [25 Cal.Rptr.2d 148, 863 P.2d 218], in determining the intent of the Legislature when it enacted a statute in 1968 we gave weight to the fact that "the Legislature has allowed the Court of Appeal's opinion in [a single 1978 decision construing the statute] to govern [the application of the statute] for the past 14 years." Here viability as an element of fetal murder has been recognized in multiple published opinions and in approved jury instructions, and the Legislature has acquiesced in that construction even longer than 14 years.

More important, the statutory language in issue here—the 1970 amendment to section 187 extending the crime of murder to the killing of "a fetus"—was itself enacted in direct and vigorous response to a judicial opinion (*Keeler*) with which the Legislature disagreed. If the Legislature had also disagreed a few years later with subsequent judicial opinions (*K.A. Smith* and its progeny) limiting the statutory prohibition against killing "a fetus" to the killing of a *viable* fetus, surely it would have spoken again, and equally vigorously. To this day, however, the Legislature has remained silent and taken no remedial action. In these circumstances its acquiescence is persuasive evidence of its intent.

### III

The lead opinion is curiously proportioned. It devotes over nine-tenths of its discussion of the main issue—i.e., whether viability is an element of fetal murder—to the relatively easy task of refuting the rationale of *K.A. Smith*,

---

[3]The same legislation likewise added a sentence to section 189 declaring that "To prove the killing was 'deliberate and premeditated,' it shall *not* be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (Stats. 1981, ch. 404, § 7, p. 1593, italics added.) This court had construed section 189 to the contrary in a series of decisions beginning with *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]. (See, e.g., *People* v. *Horn* (1974) 12 Cal.3d 290, 298 [115 Cal.Rptr. 516, 524 P.2d 1300].)

*supra*, 59 Cal.App.3d 751. (Lead opn., *ante*, pp. 803-810; see fn. 1, *ante*.) But the lead opinion spends only a few lines on the much harder task of determining the Legislature's intent when it amended section 187 in 1970. Indeed, the lead opinion essentially gives up on that task, saying the Legislature had no intent at all with regard to the meaning of the key word of the amendment: "The legislative history of the amendment suggests the term 'fetus' was deliberately left undefined after the Legislature debated whether to limit the scope of statutory application to a viable fetus." (Lead opn., *ante*, p. 803.) This statement implies that "the Legislature" as a whole conducted a full-scale "debate" on the question whether the amendment should be limited to viable fetuses, and that it was precisely because of that debate that the Legislature "deliberately" declined to adopt that limitation. This is a gross exaggeration of the legislative history. As its sole support the lead opinion cites Comment, *Killing An Unborn Child, supra*, 2 Pacific L.J. 170, 174. But that source says only that when the bill that became the 1970 amendment was heard in a committee of *one* of the houses, *one* of the committee members opposing it argued as *one* of his grounds of opposition that it should be expressly limited to viable fetuses. (*Id.* at pp. 173-174.) This is a far cry from a full-scale debate and decision on the matter *by the Legislature*. Even a formal statement by the author of a bill after it is passed is entitled to weight only "when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion." (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) When, as here, it is merely the expression of a personal position—a fortiori when voiced merely by an opponent of the bill in a committee hearing—it "is not a proper subject for consideration in determining the Legislature's intent" (*id.* at p. 701). This is primarily because such expressions of opinion "do not necessarily reflect the views of other members [of the Legislature] who voted for [the bill]." (*Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System, supra*, 6 Cal.4th 821, 831.) The lead opinion's reasoning violates these settled rules of construction.

The lead opinion next asserts that "The Legislature was clearly aware that it could have limited the term 'fetus' to 'viable fetus,' for it specifically rejected a proposed amendment that required the fetus be at least 20 weeks in gestation before the statute would apply." (Lead opn., *ante*, p. 803.) Here the lead opinion does not simply exaggerate the legislative history, it completely misreads it. It is true that in its original version the bill that became the 1970 amendment—Assembly Bill No. 816 as amended in the Assembly on June 24, 1970—provided that "As used in this section, 'human being' includes a fetus which has advanced to or beyond the 20th week of uterogestation." It is also true that the quoted language was deleted from the bill when it was again amended in the Assembly 23 days later, on July 17, 1970.

Contrary to the lead opinion's assertion, however, the quoted language had nothing to do with viability and everything to do with abortion and "quickening." It had nothing to do with viability because of the undisputed medical fact that fetuses are not viable at 20 weeks.[4] Rather, the 20-week cutoff date was inserted into the first version of Assembly Bill No. 816 for the wholly different purpose of avoiding a conflict with the Therapeutic Abortion Act, adopted only three years earlier. (Health & Saf. Code, § 25950 et seq.) One provision of that act declared that "In no event shall the termination [of a pregnancy] be approved after the 20th week of pregnancy." (Health & Saf. Code, § 25953.) By incorporating that same cutoff date into the proposed amendment to section 187, Assembly Bill No. 816 simply sought to make it clear that the fetal murder statute would not apply to therapeutic abortions. This purpose was made even clearer when the same amendment (July 17, 1970) that deleted the 20-week proviso from Assembly Bill No. 816 substituted therefor a proviso having the same effect but expressly referring to the Therapeutic Abortion Act, declaring that the fetal murder statute did not apply to any act that "complied with the Therapeutic Abortion Act, Chapter 11 (commencing with Section 25950) of Division 20 of the Health and Safety Code." (Now § 187, subd. (b)(1).)[5]

Having erroneously concluded that the Legislature had no intent with respect to the meaning of the key word "fetus" in the 1970 amendment to section 187, the lead opinion proceeds to legislate on the subject by supplying the assertedly missing definition: "a fetus," says the lead opinion, "is defined as 'the unborn offspring in the postembryonic period, after major structures have been outlined.' (Sloane-Dorland Ann. Medical-Legal Dict. (1987) p. 281.) *This period occurs in humans 'seven or eight weeks after fertilization' (ibid.)* . . . ." (Lead opn., *ante*, p. 810, italics added.) The lead opinion repeats its new definition in concluding that the malicious killing of a fetus is murder under section 187 as long as the state can show the fetus has progressed "beyond the embryonic stage of seven to eight weeks." (Lead opn., *ante*, p. 815.) For a number of reasons it is highly unlikely that such was the Legislature's intent.

[4]"Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." (*Roe* v. *Wade* (1973) 410 U.S. 113, 160 [35 L.Ed.2d 147, 181, 93 S.Ct. 705].) However, studies uniformly show that " 'the odds of survival become infinitesimal before twenty-three weeks.' " (Daniels, At Women's Expense (1993) p. 18.) The expert testimony in the case at bar fully supported these conclusions.

[5]In turn, the Therapeutic Abortion Act had adopted the 20-week cutoff date from its predecessors in other jurisdictions. The common law prohibited abortion after "quickening" (see, e.g., *Keeler, supra*, 2 Cal.3d 619, 625-626 (maj. opn.), 640-641 (dis. opn. of Burke, Acting C. J.)), and 20 weeks was traditionally believed to be the upper limit of the period in which "quickening" occurred. In modern therapeutic abortion laws, likewise, the cutoff date "usually selected is about 20 weeks, or roughly about the time of 'quickening.' " (Comment, *The Role of the Law of Homicide in Fetal Destruction* (1971) 56 Iowa L.Rev. 658, 666, fn. 44.)

As a preliminary matter, it is obvious that the Legislature would not have defined the fetal stage, as does the lead opinion, as beginning "seven or eight" weeks after conception. Perhaps doctors may speak so imprecisely, but legislators may not: the bench and bar need to know whether liability for fetal murder under section 187 attaches at seven weeks after conception or at eight weeks after conception; the choice cannot be left to the whim of the prosecuting authorities, especially when, as here, it may literally make the difference between life and death. We cannot imagine the Legislature prescribing, for example, that "Children under the age of *13 or* 14" are incapable of committing crime (see Pen. Code, § 26, par. One), or—even more relevant here—"the death penalty shall not be imposed upon any person who is under the age of *17 or* 18 at the time of the commission of the crime" (see *id.*, § 190.5, subd. (a)), or—to go from the sublime to the ridiculous—"no person shall drive a vehicle upon a highway at a speed greater than *54 or 55* miles per hour" (see Veh. Code, § 22349). The lead opinion's careless statement that liability for fetal murder attaches "seven or eight" weeks after conception is no less improper.[6]

Yet that is the least of the problems with the lead opinion's new definition of "fetus" in section 187. Because liability after seven weeks necessarily includes liability after eight weeks, we may fairly assume that prosecutors faced with the lead opinion's imprecise definition will opt for the more inclusive figure and charge murder when the fetal death occurs at seven weeks. Do my colleagues have any idea what a seven-week-old product of conception looks like?

To begin with, it is tiny. At seven weeks its "crown-rump length"—the only dimension that can be accurately measured—is approximately 17 millimeters, or slightly over half an inch. (Arey, Developmental Anatomy (1965) p. 104.) It weighs approximately three grams, or about one-tenth of an ounce. (Eichler, Atlas of Comparative Embryology (1978) p. 186.) In more familiar terms, it is roughly the size and weight of a peanut.[7]

If this tiny creature is examined under a magnifying glass, moreover, its appearance remains less than human. Its bulbous head takes up almost half

[6]The defect is not cured by the lead opinion's additional remark that "This period occurs in humans 'seven or eight weeks after fertilization' (*ibid.*), *and is a determination to be made by the trier of fact.*" (Lead opn., ante, p. 810, italics added.) The trier of *fact* does not determine the legal issue of the age at which liability for fetal murder attaches; that is the sole responsibility of the Legislature. If the Legislature determines that such liability attaches, say, at seven weeks, the sole task of the trier of fact is to determine from the evidence whether the particular fetus in the case before it had or had not reached that age.

[7]Even at eight weeks the product of conception measures only one inch and weighs only three-quarters of an ounce. (20 Encyclopaedia Britannica (15th ed. 1990) p. 412.) It is then the size of a peanut in its shell.

of its body and is bent sharply downward; its eye sockets are widely spaced; its pug-like nostrils open forward; its paddle-like hands and feet are still webbed; and it retains a vestigial tail. As Professor Cynthia R. Daniels aptly put it in her recent book, At Women's Expense, *supra*, page 20, "In fact, at eight weeks most features of the fetus are so ill defined that it would be difficult for an uninformed observer to recognize it, viewed in its entirety, as distinctly human." And as concluded in the Comment relied on by the lead opinion, "A being so alien to what we know to be human beings seems hardly worth being made the subject of murder" (Comment, *Killing of an Unborn Child, supra*, 2 Pacific L.J. at p. 185).

The contrast between such a tiny, alien creature and the fully formed "5-pound, 18-inch, 34-week-old, living, viable child" in *Keeler* (2 Cal.3d at p. 644 (dis. opn. of Burke, Acting C. J.)) is too obvious to be ignored. I can believe that by enacting the 1970 amendment the Legislature intended to make it murder to kill a fully viable fetus like Teresa Keeler's baby. But I cannot believe the Legislature intended to make it murder—indeed, capital murder—to cause the death of an object the size of a peanut.

### IV

It is even more unlikely that the Legislature intended many of the consequences of the lead opinion's new definition of "fetus" in section 187. That definition should therefore be reconsidered in light of the settled rule that "When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences. [Citations.]" (*Harris* v. *Capital Growth Investors XIV, supra*, 52 Cal.3d 1142, 1165-1166.)

First, under the lead opinion's definition a person may be subject to a conviction of capital murder for causing the death of an object that was literally invisible to everyone, and hence that the person had no reason to know even existed. A woman whose reproductive system contains an immature fetus a fraction of an inch long and weighing a fraction of an ounce does not, of course, appear pregnant. In fact, if she is one of many women with some irregularity in her menstrual cycle, she herself may not know she is pregnant: "quickening" does not occur until two or three months later. (*Keeler, supra*, 2 Cal.3d at p. 625, fn. 5.) Unless such a woman knows she is pregnant and has disclosed that fact to the defendant, the defendant has no way of knowing she is carrying a fetus.

Nor is this problem limited to fetuses that are "seven or eight" weeks old. Although the length of time that a woman can be pregnant without her

condition's becoming noticeable varies according to such factors as her height and weight, the size of her fetus, and even the style of her clothing, the case at bar demonstrates that it can extend well into her pregnancy. Here Flores testified that in her opinion her pregnancy "showed" on the date of the shooting, March 1, 1991; but defendant testified to the contrary, and there was persuasive evidence to support him. It was undisputed that Flores was only an inch over five feet in height, yet on February 5, 1991, at her last visit to her obstetrician, she weighed 191 pounds. While she was not weighed again on the date of the shooting, at that stage of her pregnancy she would have gained still more weight in the intervening three and one-half weeks. On this record Thomas Moore, M.D., an experienced perinatologist, testified that in his opinion it is "not likely" that on the date of the shooting a woman of Flores's stature would have showed her pregnancy when clothed and standing upright.

The jury evidently agreed with Dr. Moore. In both count 2 (attempted premeditated murder) and count 3 (robbery) the information alleged the five-year enhancement provided in section 12022.9. The elements of that enhancement are that during the commission of a felony a defendant who (1) "knows or reasonably should know that the victim is pregnant" (2) intentionally inflicts injury on her (3) that results in termination of her pregnancy. The instructions emphasized that to find the allegation true the jury must find "the necessary mental state . . . that defendant knew or reasonably should have known that the victim was pregnant." The jury returned verdicts finding the allegation untrue on both counts. Because the second and third elements of the allegation were undisputed and found true by the jury in other verdicts,[8] it follows that the only ground on which the jury could have found the allegation untrue was that defendant neither knew nor reasonably should have known that Flores was pregnant.

Yet the expert testimony agreed that Flores was between 23 and 25 weeks—approximately 6 months—pregnant on the date of the shooting. This is the very threshold of viability: an expert witness reported on a recent study showing that at 23 weeks the survival rate of the fetus is approximately 7 percent, at 24 weeks 35 percent, and at 25 weeks 47 percent. The case at bar thus demonstrates how long the risk of liability for fetal murder may run under the lead opinion's view before the actor either knows or has reason to know that the victim of the offense even exists. I cannot believe the Legislature intended such an enlargement of liability for the crime of capital murder.

Nor is the problem solved by the fact that section 187 imposes such liability only if the defendant kills the fetus "with malice aforethought."

---

[8] The jury convicted defendant of murdering the fetus (count 1) and found true the allegation that he intentionally inflicted great bodily injury on Flores (counts 2 and 3).

Despite the plain wording of the statute, the People may obtain a fetal murder conviction in many cases without proving malice at all: I refer, of course, to cases brought on a theory of felony murder. I turn to that theory.

Although no one would realize it from reading the lead opinion, the case at bar is truly novel: it is the first reported case in California in which a person has been convicted of fetal murder without knowing or having reason to know of the existence of the victim. In all but one of the prior cases the defendant knew very well that the woman he assaulted was pregnant; he intended at least to kill the fetus, and thus manifested express malice toward the fetus within the meaning of section 187. (See *People v. Saille, supra*, 54 Cal.3d 1103, 1114 [express malice is "an intent unlawfully to kill"].)

Two of these cases closely resembled the facts of *Keeler, supra*, 2 Cal.3d 619: in each, the defendant knew that his wife or former wife was pregnant, and assaulted her for the sole purpose of putting an end to the pregnancy; although he did not intend to kill the woman, he plainly intended to kill the fetus. (*People v. Apodaca, supra*, 76 Cal.App.3d 479, 483-484; *K.A. Smith, supra*, 59 Cal.App.3d 751, 753-754.)

Three other cases presented a related scenario in which the husband, or another acting on his behalf, knew the wife was pregnant and killed her in order to be rid of both her and the fetus in one stroke, thus manifesting express malice towards both victims. (*People v. Hamilton, supra*, 48 Cal.3d 1142, 1151-1153; *People v. Bunyard, supra*, 45 Cal.3d 1189, 1200-1201; *People v. Smith (Robert Porter), supra*, 188 Cal.App.3d 1495, 1499-1504.) In the last cited case, for example, Smith killed Annie, the wife of his lifelong friend, Skaggs, knowing she was six to seven months pregnant. In finding the requisite intent to kill, the court reasoned: "the very purpose of the murder . . . was to free Skaggs of the encumbrance of a wife *and* a child so that Skaggs could pursue a ministerial career. . . . The very motivation for the murder was the pregnancy itself. *This was not a murder of an expectant mother the murderer did not know and could not recognize as pregnant.* If the jury convicted Smith of first degree murder of both Annie and of baby Skaggs, as it did, Smith necessarily had the intent to kill both mother and child." (188 Cal.App.3d at p. 1511, second italics added.)

I have no difficulty believing that by enacting the 1970 amendment the Legislature intended to punish such intentional killing as fetal murder. But that is not this case: here defendant did not intend to kill the Flores fetus, for the simple reason that, as the jury found, he neither knew nor had reason to know it existed. Indeed, he did not even intend to kill Flores herself: although he was charged in count 2 with the deliberate and premeditated

attempted murder of Flores, the jury acquitted him of that charge, convicting him instead of the lesser included offense of assault with a firearm. (§ 245, subd. (a)(2).)[9]

Lacking proof of both malice and premeditation, the prosecutor sought a murder conviction on a theory that did not require him to prove defendant intended to kill the invisible fetus—the theory of felony murder. That theory had been invoked in the only prior fetal murder case that did not involve an intentional killing of the fetus, *People* v. *Henderson, supra,* 225 Cal.App.3d 1129. There the defendant Philip Henderson robbed and killed Ray and Angie Boggs; Angie was pregnant and her death caused the death of her fetus. The defendant was convicted of robbery and three counts of murder, and the murder convictions were upheld on a robbery felony-murder theory. But the case is distinguishable in two respects.

First, the defendant must have been well aware that Angie was pregnant. At the time of her death her fetus was 30 weeks—7½ months—old: it was therefore both viable and visible. And, contrary to the case at bar, Angie was not a stranger whom the defendant had encountered only moments before the murders; rather, the defendant had moved in with Angie and her husband and had lived with them in their apartment for some six weeks before robbing and killing them. Second, although the jury convicted the defendant of two counts of first degree murder in the deaths of Ray and Angie, they convicted him of only *second* degree murder in the death of Angie's fetus. Yet under the felony-murder rule the murder of the fetus was murder in the first degree as a matter of law no less than the murders of its parents (§ 189), and the jury were doubtless so instructed. By declining to follow that law and returning instead a verdict of murder in the second degree, the jury apparently exercised their power of nullification. (See generally, *People* v. *Dillon* (1983) 34 Cal.3d 441, 490-493 [194 Cal.Rptr. 390, 668 P.2d 697] (conc. opn. of Kaus, J.).) In so doing, the jury were "obviously looking for a way to avoid the harsh consequences of the felony-murder rule." (*Id.* at p. 490.)[10]

But if the result was harsh in *People* v. *Henderson, supra,* 225 Cal.App.3d 1129, it will be even harsher under the lead opinion's new definition of

---

[9]At the sentencing hearing the court approved that verdict: "I don't think he intended to kill the lady. I think the jury made the right decision on that."

[10]The jury exercised their power of nullification as to another murder charge as well. Ray and Angie's one-year-old son, Raymond, Jr., was likewise killed in the commission of the robbery, but the prosecution was unable to prove the specific cause of his death. Apparently for this reason the jury returned a verdict of voluntary manslaughter in the death of Raymond, Jr., even though the defendant had correctly been charged with first degree murder in that count. Interestingly, in a separate trial a second jury heard the same evidence against Velma Henderson, Philip's wife, and returned first degree murder verdicts as to all four victims; on a defense motion at sentencing, however, the court reduced Velma's convictions to the same

"fetus" in section 187. Under that definition the felony-murder rule will make a capital offense out of the death of even a nonviable and invisible fetus that the actor neither knew nor had reason to know existed. As will appear, this is such a case.

Here the prosecutor left no doubt that his theory was felony murder: as he explained to the jury in closing argument, "In some homicide cases there are many different theories of murder that may be involved, depending on the facts in the case. In this particular case there is only one murder theory, and that is what we call felony murder . . . ."

It has been clear at least since *People v. Dillon, supra,* 34 Cal.3d 441, 475, that "as a matter of law malice [including intent to kill] is not an element of felony murder."[11] Again the prosecutor made sure the jury understood the implications of that rule: he stressed in argument that "the question then becomes, did the killing occur during the commission or attempted commission of a robbery. The first thing I want you to note in doing this is when we are talking murder in this particular setting, it does not require an intent. . . . It doesn't matter if that death was intentional, unintentional or accidental."

The instructions confirmed the prosecutor's advice. The court first told the jury that to convict defendant of murder in this case the prosecution need prove only that "1. A viable human fetus . . . was killed. [¶] 2. The killing was unlawful. [¶] 3. The killing occurred during the commission or attempted commission of a robbery." There was no need to prove intent to kill or any other kind of malice aforethought. Nor was it necessary that the fetus be the object of the underlying felony. (See, e.g., *People v. Welch* (1972) 8 Cal.3d 106, 118-119 [104 Cal.Rptr. 217, 501 P.2d 225].)

On the record in this case an affirmative finding of the third element—i.e., that the killing of the fetus occurred during the commission of a robbery or attempted robbery—was foreordained, because defendant admitted in his direct testimony that he intended to rob Flores and his counsel conceded the fact in closing argument. But the finding not only made the killing felony murder, it had two additional consequences. As its second consequence, it fixed the degree of the murder at the first degree (§ 189) even though, as explained above, the jury found that defendant did not intend to kill anyone:

offenses and degrees as Philip's, thus in effect ratifying, presumably for reasons of fairness, the first jury's acts of nullification.

[11]The quotation is from the lead opinion in *People v. Dillon, supra,* 34 Cal.3d 441, concurred in by three justices. On this question, however, the lead opinion expressed the majority view, because two other justices expressly concurred in its reasoning and conclusion. (See *id.* at pp. 490 (conc. opn. of Kaus, J.), 499 (conc. & dis. opn. of Richardson, J.).)

thus the court further instructed the jury, "The unlawful killing of a viable human fetus, . . . *whether intentional, unintentional or accidental,* which occurs during the commission or attempted commission of a robbery, is murder in the first degree when the perpetrator had the specific intent to commit such robbery." (Italics added.) And as its third consequence, the same finding also constituted a "special circumstance" increasing the punishment from a term of 25 years to life with possibility of parole (§ 190, subd. (a)) to a sentence of death or life imprisonment without possibility of parole (§ 190.2, subd. (a)).

Defendant was sentenced to life imprisonment without possibility of parole. He was 20 years old at the time of the events. He had no prior felony convictions, and only two minor juvenile offenses which the prosecutor himself characterized as an "insignificant criminal history." Viewing the statutory penalty of life imprisonment without possibility of parole in the light of these circumstances, the prosecutor conceded, "It seems in a sense like a waste of a young life and to some degree it must be considered that." The court agreed that defendant "has an insignificant criminal background," and echoed the prosecutor's view of the sentence by saying, "one of the emotional issues that underlies the sentence here is that it is so sad to see a young life thrown away. And that's what's happened here with Mr. Davis."

This draconian result was possible, of course, only because of the draconian nature of the felony-murder rule itself. As we observed in *People* v. *Dillon, supra,* 34 Cal.3d at pages 476-477, footnote omitted, "the two kinds of first degree murder in this state differ in a fundamental respect: in the case of deliberate and premeditated murder with malice aforethought, the defendant's state of mind with respect to the homicide is all-important and must be proved beyond a reasonable doubt; in the case of first degree felony murder it is entirely irrelevant and need not be proved at all. From this profound legal difference flows an equally significant factual distinction, to wit, that first degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes not only the latter, but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable."

Under the lead opinion's new definition of "fetus" another category will be added to this litany: first degree felony murder will be extended to include any death, in the commission of a listed felony, of a nonviable and invisible fetus that the actor neither knew nor had reason to know existed. And that liability will not be limited to cases in which, as here, the defendant

intentionally assaults the pregnant woman with a deadly weapon. It will extend, for example, to the following scenario: an unarmed 18-year-old with no criminal record enters a store during business hours, intending to shoplift a can of spray paint; when a security guard accosts him, his nerve fails and he bolts for the door; in his haste he accidentally knocks a woman shopper to the floor; unknown to anyone the woman is 7 weeks' pregnant, and the trauma of the fall causes her to miscarry.

Before today's decision, such a youth would be guilty at most of second degree burglary (§§ 459, 460; see, e.g., *People* v. *Corral* (1943) 60 Cal.App.2d 66, 70-71 [140 P.2d 172], and cases cited) and would be punishable by either county jail time of up to one year or a prison term of sixteen months or two or three years (§§ 18, 461); because the fetus was not viable, its death would not have been murder on any theory. After today's decision, however, this teenager could also be found guilty of first degree murder of the fetus on a burglary felony-murder theory (cf. *People* v. *Earl* (1973) 29 Cal.App.3d 894, 898-900 [105 Cal.Rptr. 831]); in that event his punishment would at least be imprisonment for 25 years to life (§§ 190, subd. (a)), and he would be subject to a burglary special-circumstance allegation which, if found true, would require the punishment of either death or life imprisonment without possibility of parole (§ 190.2, subd. (a)(17)(vii)).[12]

I cannot believe the Legislature intended the 1970 amendment to accomplish so absurd a result—especially when that amendment affected a statute that requires a finding of "malice aforethought" to support a conviction (§ 187) and had nothing to do with the statute that defines felony murder (§ 189). Yet this is where the lead opinion's definition of "fetus" inexorably takes us.

In addition, by thus expanding the scope of the felony-murder rule the lead opinion violates another settled policy of this court: almost three decades ago, in the leading case of *People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130], Chief Justice Traynor stressed that "The felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability. [Citations.] Although it is the law in this state (Pen. Code, § 189), *it should not be extended beyond any rational function that it is designed to serve.*" (Italics added, fn.

---

[12]Indeed, to reach this result it would not even be necessary for the youth to touch the woman. It would be sufficient if the stress induced by the sight and sounds of the oncoming youth and the pursuing guard were severe enough to cause her to faint, fall, and thereby miscarry. (Cf. *People* v. *Hernandez* (1985) 169 Cal.App.3d 282, 287 [215 Cal.Rptr. 166] [robber did not touch victim, but victim nevertheless died of stress-induced heart attack during robbery; held, first degree felony murder].)

omitted.) We have respected and reiterated his admonition until this day (see, e.g., *People* v. *Dillon, supra,* 34 Cal.3d at pp. 462-463, citing numerous cases), most recently in *People* v. *Patterson* (1989) 49 Cal.3d 615, 621-622 [262 Cal.Rptr. 195, 778 P.2d 549]. As the foregoing scenario demonstrates, however, to apply the felony-murder rule to the unintentional death of a nonviable and invisible fetus that the actor neither knew nor had reason to know existed will clearly extend the rule beyond any rational function it is designed to serve.

The cases also illustrate that irrational punishments may provoke one of two undesirable responses. First, as apparently occurred in *People* v. *Henderson, supra,* 225 Cal.App.3d 1129, the jury may be driven to exercise its power of nullification. Second, as we did in *People* v. *Dillon, supra,* 34 Cal.3d at pages 477-489, a court may be compelled to hold that on the facts of the case a first degree murder conviction is a violation of the state cruel or unusual punishment clause. I cannot believe the Legislature intended to encourage either response by the 1970 amendment to section 187.[13]

Next, the lead opinion's new definition of "fetus" will raise difficult questions of causation in prosecutions for murder of a nonviable fetus. Although a conviction on a felony-murder theory does not require proof of a "strict causal relation" between the felony and the killing (see, e.g., *People* v. *Welch, supra,* 8 Cal.3d 106, 118), some act of the defendant during the commission of the felony must at least have been a "substantial factor" contributing to the death (e.g., *People* v. *Stamp* (1969) 2 Cal.App.3d 203, 210 [82 Cal.Rptr. 598]), just as is required for convictions on a theory of express or implied malice (e.g., *People* v. *Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274]). Here the problem is medical reality: in lowering to seven weeks the age of a fetus whose death can trigger a murder prosecution, the lead opinion overlooks the fact that the more immature the fetus, the more likely it is to die in any event by spontaneous abortion.[14] Spontaneous abortions are caused by a variety of factors, including genetic or developmental defects in the fetus, uterine abnormalities, maternal trauma, illness, or substance abuse, toxins in the fetal or maternal

---

[13]The lead opinion seems to recognize this problem, at least in part, by protesting that it does not reach the question "whether the doctrine of felony murder *constitutionally* could be applied" when the fatal injury to the fetus is caused by an agency other than a defendant's "direct assault on the mother." (Lead opn., *ante,* p. 810, fn. 2, italics added.) The problem, however, is not so much the cause of the fatal injury to the fetus as it is the viability and visibility of the fetus itself. If the fetus is viable and visible, the defendant is on notice of the mother's condition and under settled felony-murder principles should be liable for the death of the fetus even without committing a "direct assault on the mother." It is when the fetus is nonviable and invisible that the lead opinion's construction of section 187 may lead to absurd consequences of the kind discussed above.

[14]Spontaneous abortion is the medical term for miscarriage. (Stedman's Medical Dict. (5th Lawyers' ed. 1982) p. 3.)

environment, etc. And they are much more common than is generally realized, particularly in the early stages of pregnancy: "The incidence of spontaneous abortion is generally believed to be 15-20% of all pregnancies. Substantial numbers of [spontaneous] abortions, however, are unreported or are very early and subclinical; some have estimated the true incidence to be as high as 50-78% [of all pregnancies]." (Rogge, *Spontaneous Abortion*, in Manual of Obstetrics (Niswander edit. 1987) p. 213, fn. omitted.)

Accordingly, the mere fact that a fetus aborts at some time after the woman carrying it is intentionally or unintentionally struck by another does not necessarily mean the act was a "substantial factor" in causing the fetal death. In cases in which the fetus was nonviable and immature the prosecutor could well have difficulty in proving causation, or, conversely, the jury could be misled into convicting the actor of fetal murder when no such murder in fact occurred. Again I cannot believe the Legislature intended either result by the 1970 amendment to section 187.

V

Finally, the lead opinion's construction of the 1970 amendment will make our murder law unique in the nation in its severity: it appears that in no other state is it a capital offense to cause the death of a nonviable and invisible fetus that the actor neither knew nor had reason to know existed.

To begin with, in the majority of states the killing of a fetus is not a homicide in any degree: "The majority of jurisdictions which have confronted the issue has followed *Keeler*, 2 Cal.3d 619, . . . in holding the term 'fetus' does not fall within the definition of a human being under criminal statutes unless the term is so defined by the legislature." (*State* v. *Trudell* (1988) 243 Kan. 29 [755 P.2d 511, 515].) In those jurisdictions a live birth remains a prerequisite to a conviction of homicide. (See *Meadows* v. *State* (1987) 291 Ark. 105 [722 S.W.2d 584, 585-586], citing numerous cases; for later cases, see, e.g., *Billingsley* v. *State* (1987) 183 Ga.App. 850 [360 S.E.2d 451, 452]; *State* v. *Keller* (La.Ct.App. 1991) 592 So.2d 1365, 1366; *State* v. *Beale* (1989) 324 N.C. 87 [376 S.E.2d 1, 2-4]; *State* v. *Evans* (Tenn.Crim.App. 1987) 745 S.W.2d 880, 881-884.)

There are, of course, jurisdictions that have enacted statutes criminalizing the killing of a fetus.[15] The lead opinion cites seven such jurisdictions. (Lead opn., *ante*, p. 808, fn. 1.) My research has turned up at least 22, with 2 additional jurisdictions so holding as a matter of common law. For convenience I have grouped these jurisdictions into three distinct categories.

First, in at least 13 jurisdictions the killing of a fetus is not criminal unless the fetus is viable or has reached a gestational age significantly more

---

[15]Like the lead opinion, I do not refer in this context to abortion laws.

advanced than the "seven or eight weeks" prescribed by the lead opinion. Thus in Iowa any person who intentionally kills a fetus "after the end of the second trimester of the pregnancy" commits the crime of "feticide." (Iowa Code Ann. § 707.7.) In New York, homicide includes the killing of "a person or an unborn child with which a female has been pregnant for more than twenty-four weeks" (N.Y. Penal Law § 125.00). In England, where the common law rule that fetal murder is not a crime first arose, a statute now provides that any person who intentionally causes a fetal death commits the crime of "child destruction" provided the fetus was "capable of being born alive," and the fact that the woman had been "pregnant for a period of twenty-eight weeks or more" is prima facie proof that the fetus was viable. (Infant Life (Preservation) Act, 1929, 19 & 20 Geo. 5, ch. 34, § 1.)

In South Carolina the state's highest court has adopted, pursuant to its common law power to declare substantive criminal law, the rule that the intentional killing of a fetus is murder if the fetus was viable. (*State* v. *Horne* (1984) 282 S.C. 444 [319 S.E.2d 703, 704].) The highest court in Massachusetts has so held in two cases in which the fetus was in fact viable, but has not yet taken a position on whether viability is a legal prerequisite to such liability. (*Commonwealth* v. *Lawrence* (1989) 404 Mass. 378 [536 N.E.2d 571, 575, fn. 6] [murder]; *Commonwealth* v. *Cass* (1984) 392 Mass. 799 [467 N.E.2d 1324, 1329, fn. 8] [vehicular homicide].)

Eight states have enacted statutes criminalizing the killing of "an unborn *quick* child." In three of those states the act is criminal if the unborn child is killed by "any" injury to the mother. (Nev. Rev. Stat. § 200.210; Okla. Stat. Ann. tit. 21, § 713; Wash. Rev. Code Ann. § 9A.32.060.) In the remaining five states, however, the act is criminal only if the unborn child is killed "by any injury to the mother of such child which would be murder if it resulted in the death of such mother." (Fla. Stat. Ann. § 782.09; Ga. Code Ann. § 16-5-80; Mich. Comp. Laws Ann. § 750.322; Miss. Code Ann. § 97-3-37; R.I. Gen. Laws Ann. § 11-23-5.) Yet in seven of those states—all except Georgia—the resulting fetal homicide is punished only as manslaughter, while in Georgia it is deemed "feticide." As noted, in all eight states there is no crime unless the unborn child was "quick" when it was killed. In all but one of those states the statute does not define "quick"; as explained hereinabove, "quickening" is traditionally said to occur between the 16th and 20th weeks of pregnancy. And in the one state that does define the term, the legislature has given "quick" the same meaning as "viable": "For the purposes of this section 'quick child' shall mean an unborn child . . . who is so far developed and matured as to be capable of surviving the trauma of birth with the aid of usual medical care and facilities available in this state." (R.I. Gen. Laws Ann. § 11-23-5, 3d par.)

The second category of jurisdictions is composed of those in which the legislature has expressly declared that the killing of a product of conception

is criminal regardless of its gestational age; contrary to our section 187, therefore, these statutes purport to apply to both viable and nonviable fetuses and to embryos—even to zygotes.[16] There are at least six states in this category. In three the crime is not murder but a lesser offense. Thus Arizona's statute is modeled on those of the eight states discussed above that criminalize the killing of an unborn child by means of an injury to its mother; unlike those statutes the Arizona measure applies not just to a "quick" unborn child but to an unborn child "at any stage of its development"; like those statutes, however, the Arizona offense is deemed manslaughter. (Ariz. Rev. Stat. Ann. § 13-1103.) Arkansas and New Mexico have essentially identical statutes making it an offense to inflict an injury on a pregnant woman, in the commission of a felony, that causes miscarriage or stillbirth; each defines miscarriage as "the interruption of the normal development of the fetus" and stillbirth as fetal death in utero "irrespective of the duration of pregnancy." (Ark. Code Ann. § 5-13-201; N.M. Stat. Ann. § 30-3-7.) In Arkansas the offense is deemed first degree battery and is punishable by imprisonment for not less than five nor more than twenty years (Ark. Code Ann. § 5-4-401); in New Mexico the offense is called "injury to [a] pregnant woman" and is punishable by imprisonment for three years with a possible fine of $5,000 (N.M. Stat. Ann. § 31-18-5).

Three other states have enacted special statutes making the killing of a fetus homicide under various circumstances, but none punishes fetal murder as severely as our section 187. Thus in Illinois the offense is called "intentional homicide of an unborn child," and the statute defines an unborn child as "any individual of the human species from fertilization until birth." (Ill. Comp. Stat. Ann. ch. 720, § 5/9-1.2, subd. (b).) But the statute further provides that the act is not homicide unless the actor actually "knew that the woman was pregnant." (*Id.*, subd. (a)(3).)[17] And the punishment for this crime "shall be the same as for first degree murder, *except that the death penalty may not be imposed.*" (Ill. Comp. Stat. Ann. ch. 720, § 5/9-1.2, subd. (d), italics added.)

---

[16]The zygote is the product of conception after fertilization but before the embryo stage. (26 Encyclopaedia Britannica, *supra*, p. 710.)

[17]It is clear that *actual* knowledge of the pregnancy is required. The statute's predecessor was a feticide law criminalizing the act if the actor "knew, *or reasonably should have known under all of the circumstances,* that the mother was pregnant." (Former Ill. Rev. Stat. ch. 38, par. 9-1.1, subd. (a)(4), italics added.) The Illinois Legislature deleted the italicized clause when it substituted the present wording in 1987; since that date the prosecution has been required to prove actual knowledge of the pregnancy for a conviction of intentional homicide of an unborn child. For example, in the case relied on by the lead opinion, *People* v. *Ford* (1991) 221 Ill.App.3d 354 [Ill.Dec. 766, 581 N.E.2d 1189, 1202], the defendant assaulted his girlfriend, Karonda, for the purpose of killing her eight-and-one-half-month-old fetus; the court affirmed the conviction because, inter alia, "The evidence in this case was sufficient to prove beyond a reasonable doubt that defendant knew Karonda was pregnant . . . ."

In Minnesota and North Dakota the offense is called "murder of an unborn child," and the latter is defined as the "conceived, but not yet born" offspring of a human being. (Minn. Stat. Ann. §§ 609.266, 609.2661; N.D. Cent. Code §§ 12.1-17.1-01, 12.1-17.1-02.)[18] In Minnesota the offense is murder of an unborn child in the first degree if the actor kills the unborn child either with premeditation and "with intent to effect the death of the unborn child or another," or while committing certain serious listed felonies; in either event, however, the maximum punishment is life imprisonment. (Minn. Stat. Ann. § 609.2661.)[19] In North Dakota the offense is the most severely punished if the unborn child is killed with express or implied malice or in the commission of certain serious listed felonies; yet in either event the maximum penalty is life imprisonment (N.D. Cent. Code § 12.1-32-01).

The third and last category of jurisdictions is composed of those in which the statute neither prescribes a minimum gestational age for a conviction of fetal murder nor expressly declares that it applies regardless of gestational age; rather, the statute is facially silent on the matter. California is such a jurisdiction, and there are at least five others. Of these Utah is the only state that, like California, criminalizes the killing of a fetus under its general murder statutes: it defines homicide as the killing of "another human being, including an unborn child." (Utah Code Ann. § 76-5-201, subd. (1)(a).) But unlike California, in Utah the crime is a capital offense only if the actor caused the death of the unborn child "intentionally or knowingly," *even in a felony-murder case.* (*Id.*, § 76-5-202, subd. (1)(d).) If, as in the case at bar, the death occurred in the commission of a listed felony but the actor did not kill "intentionally or knowingly," the crime is noncapital murder (*id.*, § 76-5-203) punishable by imprisonment for not less than five years (*id.*, § 76-3-203).

In the remaining four states the offense is given special treatment and is punished much less severely than in California. In two of these states the

[18]The North Dakota statute adds a qualifying clause to the definition: an unborn child is a conceived but not yet born offspring "which, but for the action of the actor would beyond a reasonable doubt have *subsequently* been born alive." (N.D. Cent. Code § 12.1-17.1-01, subd. 3, italics added.) I find no North Dakota case construing this ambiguous language. Lacking such guidance, I am inclined to believe that the added clause does not impose a viability requirement—if it were not for the crime, even an embryo or a previable fetus would have "subsequently" been born alive—but was meant to limit liability to cases in which the defendant's act was the sole cause of the premature death.

[19]The Minnesota statutory scheme is very thorough, separately defining the offenses of murder of an unborn child in the first, second, and third degrees, manslaughter of an unborn child in the first and second degrees, "criminal vehicular operation resulting in death to an unborn child," and death of an unborn child in the commission of an unlisted felony. (Minn. Stat. Ann. §§ 609.2661-609.2665, 609.21, subd. 3, 609.268, subd. 1.) In addition, most of these offenses can be committed in several ways; for example, in what appears to be a classic case of a state legislature's response to local conditions, in Minnesota the statute specifically makes it second degree manslaughter to cause the death of an unborn child by shooting its mother "as a result of negligently believing her to be a deer" (*id.*, § 609.2665, subd. (2)).

offense is deemed "feticide." Thus in Indiana one who "knowingly or intentionally" terminates a pregnancy commits feticide (Ind. Code Ann. § 35-42-1-6), punishable by imprisonment for four years with a possible fine of not more than $10,000 (*id.*, § 35-50-2-6). In Louisiana one who kills an unborn child intentionally or in the commission of a listed felony commits first degree feticide punishable by imprisonment for not more than 15 years. (La. Rev. Stat. Ann. § 14:32.6.) In South Dakota one who "intentionally kills a human fetus by causing an injury to its mother" commits a felony (S.D. Codified Laws § 22-17-6) punishable by imprisonment for 10 years with a possible fine of $10,000 (*id.*, § 22-6-1).[20] And in New Hampshire one who "Purposely or knowingly causes injury to another resulting in miscarriage or stillbirth" commits first degree assault (N.H. Rev. Stat. Ann. § 631:1, subd. I(c)) punishable by imprisonment for not more than 15 years with a possible fine not to exceed $4,000 (*id.*, § 651:2).

Robert Keeler's act of assaulting his estranged wife for the express purpose of terminating her pregnancy by knowingly and intentionally killing her fully viable fetus would have been a crime in all the jurisdictions discussed above that have abrogated the common law rule. It would certainly be a crime in California today. But I cannot believe that in amending section 187 to make that act a crime the Legislature also intended to make California the only state in the Union in which it is a capital offense to cause the death of a nonviable and invisible fetus that the actor neither knew nor had reason to know existed. Yet this, again, is where the lead opinion's construction of the 1970 amendment inexorably takes us. I dissent from that construction.

## VI

I also dissent from the lead opinion's disposition of this appeal. I agree with the lead opinion that the instruction defining viability in terms of mere "possible" survival was prejudicial error. I would nevertheless reverse the judgment of the Court of Appeal because it remands the murder count for a new trial, and would direct the Court of Appeal to order the trial court to enter a judgment of acquittal on that count. (§§ 1260, 1262; see, e.g., *People v. Carlson* (1974) 37 Cal.App.3d 349, 359 [112 Cal.Rptr. 321].) On the facts of this case a retrial of the murder count will be a futile exercise and hence a total waste of court time, prosecutorial resources, and taxpayers' money. In such a retrial, as the lead opinion correctly holds, the prosecution will be required to prove beyond a reasonable doubt that the Flores fetus was viable in the sense that its survival was not merely possible but probable, i.e., that

---

[20]The quoted wording of the South Dakota statute shows the lead opinion is incorrect in asserting that "no state has criminalized the nonconsensual killing of a 'fetus' . . . ." (Lead opn., *ante*, p. 807.)

it had better than 50 percent chance of surviving premature birth and the neonatal period (28 days after birth). But as the lead opinion correctly observes, "in this case *none* of the medical experts who testified at defendant's trial believed that the fetus had a 'probable' chance of survival." (Lead opn., *ante*, p. 814, italics added.) And the prosecution's failure to prove such viability was not through want of trying. The bulk of the prosecution's case was devoted to presenting the testimony of medical experts on the issue of viability. Among other experts the prosecution called three eminent physicians—a pediatric pathologist, a neonatologist, and a perinatologist—who were all highly experienced in determining fetal viability, and *not one* could testify that the Flores fetus would "probably" have survived premature birth and the neonatal period.[21] The unanimity of the witnesses, moreover, mirrored the uniform conclusions of the medical literature, which they discussed in detail on the stand.

The prosecution thus took its best shot at proving viability, and on the facts of this case was wholly unable to do so. In a retrial the medical facts will not change: a nonviable fetus will remain nonviable. Given this reality, it is highly unlikely that the prosecution will be able to make a better case for viability, let alone prove that element beyond a reasonable doubt. In these circumstances no purpose will be served by compelling the physician witnesses to repeat their lengthy testimony or by putting the survivors—Mrs. Flores and her family—through the ordeal of once again reliving the events in public. Rather, we should exercise our discretion to end this litigation so that the defendant may serve the multiple and consecutive terms of imprisonment to which he was sentenced for the crimes he actually committed.

---

[21]The testimony of two equally qualified and experienced physicians called by the defense was to the same effect.